Filed 6/7/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)     S078027
    v. )
)
HOWARD LARCELL STREETER, )
)     San Bernardino County
    Defendant and Appellant. )     Super. Ct. No. FVA07519
_____ )

A jury convicted defendant Howard Larcell Streeter of the first degree murder of Yolanda Buttler. (Pen. Code, § 187.)[1] It found true special-circumstance allegations of lying in wait (§ 190.2, subd. (a)(15)) and the intentional infliction of torture (§ 190.2, subd. (a)(18)). The trial court declared a mistrial as to the penalty phase after the jury could not reach a verdict. At the beginning of the penalty phase retrial, the trial court released the jury after granting defendant's motion for a continuance. At the second penalty retrial, the jury returned a verdict of death, and the trial court imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

**1**     All further statutory references are to the Penal Code unless otherwise indicated.

1

## I. FACTS

### A. Guilt Phase

#### 1. *The Prosecution's Case*

Defendant and Yolanda Buttler lived together for about five years in Fontana. They lived with their child, "Little Howie," Yolanda's two older children, Patrick and Lawanda, and Yolanda's niece, Shavonda.

In December 1996, Yolanda told her siblings, Lucinda and Quentin Buttler, that defendant was beating her and had pulled hair, and that she was afraid of him and wanted to leave him. They agreed to help Yolanda secretly move out of her home when defendant was at work. Quentin advised Yolanda to get a restraining order.

In early January 1997, Yolanda moved out with the children. Initially, Yolanda went to her sister's house in Los Angeles, but then she decided to stay in a motel for safety reasons. After a week's stay in the motel, Yolanda and the children moved to an apartment in Victorville.

On February 7, 1997, Yolanda applied for a restraining order against defendant. In her declaration, she described an incident that had occurred on December 30, 1996, during which defendant had pulled her braided extensions so hard because she would not have sex with him that he pulled hair out of her head.

In April 1997, defendant called Yolanda and convinced her to allow him to see Little Howie. They met in a public area without incident. Afterwards, defendant called frequently and tried to convince Yolanda to reconcile with him. He wanted to see Little Howie again. Yolanda agreed to meet him at a Chuck E. Cheese restaurant in Fontana.

On April 27, 1997, Yolanda drove to the restaurant with Patrick, Shavonda, and Little Howie.[2] Patrick accompanied his mother to protect her; Yolanda was nervous that defendant had obtained their telephone number in the Victorville area and had been calling them frequently in an attempt to get back together with her.[3] When they arrived at the restaurant, defendant was waiting for them. He was clapping his hands and appeared nervous. Patrick and Little Howie got out of the car, while Yolanda and Shavonda stayed inside the car. Defendant grabbed Little Howie and proceeded towards his car in the parking lot. Yolanda asked, "Where are you taking him?" Defendant replied that he was taking him and said not to worry.

Patrick stated that Yolanda followed defendant in her car, parked next to defendant's car, and got out of her car. Yolanda and defendant began to argue. Yolanda tried to take Little Howie out of defendant's car, but defendant pushed her away. They began pushing each other. Defendant went to the trunk of his car and retrieved a plastic container with gasoline in it. Seeing this, Yolanda ran back towards her car. Defendant chased her and poured gasoline on the front of her car. Yolanda was on the other side of the car and tried to run away, but defendant caught up to her and poured gasoline on her.

In the meantime, Shavonda — who was disabled and wore leg braces — was still in the back seat of Yolanda's car. Patrick smelled gasoline and was scared because he knew the car could catch on fire. He jumped inside the car, drove it to the end of the parking lot, and ran back towards Yolanda and

---

[2]     At the time of trial (one and one-half years after the offenses), Patrick was 15 years old, Lawanda was 16 years old, Little Howie was six years old, and Shavonda was eight years old.

[3]     A large part of Patrick's testimony was admitted by stipulation after he became very emotional on the witness stand.

defendant. When he got to them, Patrick saw that Yolanda and the plastic container were on the ground and defendant was hitting Yolanda.

Bystanders also witnessed the events. John Martinez was in the restaurant's parking lot when he heard a woman yelling for help. A "couple of" children were nearby. Martinez heard defendant yelling and saw him beating Yolanda and pulling her hair. Defendant struck Yolanda more than four times and slammed her to the ground. He went to his car, took out what appeared to be a plastic antifreeze container from the trunk, and poured gasoline from the container onto Yolanda's car and then on her body. Martinez then saw Patrick drive Yolanda's car to another area of the parking lot. Defendant dragged Yolanda back towards his car "because he had nothing to light the lady with." Martinez ran into a store next to the restaurant and told the owner to call 911. When Martinez and the owner went outside, Yolanda was already on fire and was burning from the top of her head to her waist. People were throwing water on her and wrapping her in blankets.

Anzerita Chonnay also saw the incident. She heard Yolanda and defendant yelling at each other and saw defendant hitting and kicking Yolanda. Chonnay ran inside a store to have someone call 911. When she returned outside, Chonnay saw defendant retrieve a container from the trunk of his car and began pouring something from it, while people were yelling at him. A man tried to intervene, but defendant pushed him away. Chonnay then saw Yolanda "on fire." The flames shot up "real high." Several people tried to extinguish the fire with their clothing. While Yolanda was burning, Patrick watched as he held the two younger children.

Edward Jasso was seated in his car in the restaurant's parking lot and saw Yolanda and defendant in the parking lot. Jasso saw liquid being thrown. At first, Jasso thought they were having a water fight, but then realized they were not playing after he saw defendant push Yolanda to the ground. Defendant began hitting and kicking Yolanda, and called her a "fucking bitch." Jasso got out of his

4

car and told defendant to leave Yolanda alone. Defendant dragged Yolanda by her hair towards his car, released her, went to his car, and took off his shirt. Dazed, Yolanda began walking towards the Chuck E. Cheese restaurant. Jasso saw defendant retrieve something from his car. Thinking that the item might be a gun or knife, Jasso yelled for everyone to run. Defendant came towards Jasso and Yolanda and was holding a cigarette lighter. Jasso tried to grab the lighter from defendant, but his hand slipped off because defendant's arm was wet from gasoline. Defendant caught up to Yolanda and lit the lighter while he was only three to four inches away from her. Yolanda "went up in flames" immediately. When defendant lit the lighter, Jasso tried to grab him, but having accidentally grabbed Yolanda instead, Jasso's arm also caught on fire. Defendant fled as Jasso tried to extinguish the fire on his arm.

Richard Humphreys saw people yelling at defendant, who was running away from the scene. Humphreys got into his truck, followed defendant, and saw him attempting to climb a fence. Humphreys ordered defendant to stop. Defendant climbed down and began walking away. The police arrived and arrested defendant. Defendant smelled very strongly of gasoline and appeared to be under the influence of alcohol. However, defendant's blood sample, drawn at 5:39 p.m. that night, showed no signs of drugs or alcohol.[4]

When the paramedics arrived, they saw Yolanda standing within arm's reach of the children. She was calling to them and trying to grasp them. Yolanda was crying, screaming, and in pain. Her clothing was black, burnt, and smoldering, and had melted onto her skin. The paramedics tried to cool Yolanda down with saline solution. During the ride to the hospital, Yolanda was crying

---

[4]     The 911 call reporting Yolanda on fire was received at 3:21 p.m.

and screaming in pain, and repeatedly asked about her children. The paramedics reassured her that the children were with the police. Because Yolanda's burns were so deep and her skin was so thickened, the paramedics could not find or gain access intravenously to a vein and were unable to administer pain medication to Yolanda. Instead, they attempted to relieve her pain by pouring cold water on her burns. While being transported, Yolanda grasped one of the paramedics, pulled him close to her face, and begged, "Just kill me. Please kill me." Yolanda endured the 20-minute ambulance ride without any pain medication.

Yolanda was admitted to the hospital in critical condition. She suffered extensive second and third degree burns from the waist up, including her entire face, arms, front chest, and back. Yolanda sustained burns to 55 to 60 percent of her body's surface. According to the pathologist, the extent of the pain suffered from these burns could be extreme and severe. Her lungs were dense and swollen, evidence of organ failure. Yolanda was treated in the hospital's burn unit for 10 days until her death. She died from pulmonary failure caused by the effects of thermocutaneous burns.

At the scene, the police found a clump of Yolanda's hair, one earring, and the plastic container. Defendant's car was in the parking lot with a "Club" locking device on the steering wheel and the car's gas cap sitting on its bumper. Defendant's shoes, the plastic container, and several items of Yolanda's clothing tested positive for gasoline residue. No gasoline residue was found on defendant's shorts, socks, or underwear, or on Yolanda's earrings or hair.

Inside the glove compartment of defendant's car, the police found a note written by defendant on the back of a smog certificate attached to a vehicle registration form. The note read:

"to mom and pop, I hate to do you gys like this but I don't like liveing the way I am so I don't know what to say but I love you both and I am very sorry to

6

have to put you though this but my life is over I don't have any thing to live for any more, I know it going to cost a lot to berrie me but I am sorry I hope you both understand and I know what I did to Youlanda is worng but she don't dersive to live like me. P.S. If you can get my son Baby Howie and raise him to the best of your abbilty. Tell him his dady is sorry for what I did but I will alway love him and to don't never fall in love with a women. Love alyaw Howie." (Errors in original.)

A sheriff's detective from the arson squad and a captain from the fire department conducted a joint investigation and concluded that gasoline had been poured on Yolanda and ignited.

### 2. *The Defense Case*

Defendant's defense was that he caused Yolanda's death, but did not intend to kill or torture her. Defendant claimed that he was so emotionally distraught, upset, and angry at Yolanda for taking his son away from him, for being late that afternoon, and for making him wait at the restaurant, that he was guilty of, at the most, second degree murder or voluntary manslaughter when he poured gasoline on Yolanda and ignited it.

Defendant testified in his own defense. He stated that he and Yolanda had lived together since 1991 and had had a loving relationship until 1996, when their relationship began to fall apart. According to defendant, the strain was caused by Yolanda's desire to buy a house, which defendant could not afford.

Defendant stated that when he came home on January 4, 1997 about 4:00 p.m., he discovered that Yolanda had moved out with the children. She had given no indication she was leaving and had taken some of the furniture and electronic equipment. He was hurt and in shock. He called Yolanda's brother, Victor, who claimed that he did not know her whereabouts. Defendant bought alcohol and

7

rock cocaine, went back to his home, drank the alcohol and took the drugs until 10:00 or 11:00 p.m., and called Victor again. Victor told defendant to stop calling.

Defendant then went to Victor's house to find Yolanda. When no one answered the door, defendant broke Victor's wife's van window with a bat. He then went to the house of another of Yolanda's brothers. When no one answered the door, defendant yelled that he wanted his wife and kids back, threw a rock through a window, and drove to Yolanda's sister's house. When her sister Lucinda told defendant she did not know where Yolanda was, he warned that if they tried to keep his family from him, something bad would happen to them.

Defendant called Victor again the next day. This time, Victor said that Yolanda and Little Howie were there, and that he could get his son. When defendant arrived at Victor's house, Victor told him to put his gun down, although defendant denied he had a gun. Victor kept stalling him. Suspecting that Yolanda and his son were not there and that he was being set up, defendant decided to leave. As he was driving away, he saw that police officers were parked around the corner waiting for him. The officers stopped and arrested him, and took him to jail. Defendant pleaded guilty to one count of assault with a deadly weapon and was released from jail on February 28, 1997.

Defendant then "moved from place to place," having lost his apartment while he was in jail. Two weeks after his release, defendant's mechanic called and demanded payment for servicing Yolanda's car. After defendant refused to pay unless the mechanic told defendant where Yolanda was staying, the mechanic provided Yolanda's telephone number. Defendant called Yolanda and said he loved her and wanted her back. She refused to give him another chance. Defendant called again that same night and told Yolanda he wanted to see the children. Agreeing to meet with defendant at the Discovery Zone, Yolanda

8

brought Little Howie and Shavonda and spent an hour and 45 minutes with him. When defendant said he wanted to see them again, Yolanda told him to call.

During the next several weeks, defendant repeatedly called Yolanda and told her he wanted her back. When she refused, defendant warned that if she did not return, he would do something to himself. They agreed to meet at a Chuck E. Cheese restaurant at 4:00 p.m. on April 27, 1997. Defendant stated that he arrived on time, and became angry and frustrated because he waited for Yolanda and the children for 30 to 45 minutes. When Yolanda drove up, defendant took Little Howie out of Yolanda's car, declared he was going to leave, placed Little Howie inside his car, and got into the driver's seat. As he tried to remove the locking device from the steering wheel, Yolanda began arguing with defendant about taking Little Howie, and scratched and hit defendant. Defendant pushed her away and got out of the car. They got into a "scuffle." Defendant stated that he took out the container of gasoline that he normally kept in the trunk of his car for his carburetor, but did not know why he took the container out. He was upset and in a "rage" and remembered only "bits and pieces" of the proceeding events, including pouring gasoline on Yolanda and himself. Someone tried to grab him, and the next thing he knew, they were both on fire.

Defendant testified that he did not intend to set Yolanda on fire and kill her. Regarding the note, defendant explained that it was a suicide note and his statement he knew what he did to Yolanda was wrong was only a reference to the December 30, 1996 incident, the subject of Yolanda's declaration for the restraining order. Defendant claimed that, during that incident, they argued over Yolanda's refusal to have sex with him and that he only pulled on Yolanda's braided hair extensions so that she would come to bed. He denied raping her and claimed he still loved her. Defendant further claimed that he did not intend to hurt Yolanda. Instead, when he wrote that Yolanda did not deserve "to live like me,"

9

he meant only that she did not deserve to live the lifestyle that he was living (i.e., drinking alcohol and taking drugs) and that she deserved a house, which he could not afford. He intended to show the note to Yolanda in the hope she would feel sorry for him and take him back. The note asked his parents to raise Little Howie because defendant did not want him to be raised by a stepfather.

On cross-examination, defendant admitted that although the note was dated April 27, 1997, he wrote the note three to five days earlier when he was drinking. Defendant claimed that he did not know how his gas cap got on the bumper, but thought that he might have left it there when he put gasoline in his car in Los Angeles before driving to the Chuck E. Cheese restaurant in Fontana. He denied that he siphoned the gasoline from his fuel tank to put into the plastic antifreeze container before Yolanda's arrival. Defendant denied that he planned to run away from the scene and that he put the Club on his car to prevent its theft after he fled.

On redirect examination, defendant testified that when he grabbed Little Howie from Yolanda's car, his intent was to leave with the baby.

### 3. Rebuttal

Yolanda's children, Patrick and Lawanda, testified about their mother's and defendant's relationship. Patrick stated that defendant was mean to Yolanda and that Patrick went to Chuck E. Cheese so that nothing bad would happen. He did not see defendant attempt to remove the Club from the steering wheel.

Lawanda stated that she disliked defendant because he threatened Yolanda, pushed her around, and threw things at her. Lawanda described the December 30, 1996 incident. She was awakened by her mother's screams. Lawanda saw defendant pulling Yolanda's hair and dragging Shavonda by her leg braces, while Little Howie watched. Defendant warned Lawanda that if she wanted to watch, he would pull her mother's hair even harder. Defendant got on top of Yolanda and

10

did "something sexually" to Yolanda after she refused to have sex with him. According to Lawanda, defendant "tortured" Yolanda for hours and Yolanda complained her head was sore the next day. Defendant would throw things around and shove Yolanda around "continually." He behaved this way during the last year of their relationship, and possibly even before.

Yolanda's brother, Victor Buttler, testified that on January 4, 1997, defendant pounded loudly on Victor's door around 3:00 or 4:00 a.m. He then broke the window of Victor's wife's van. When Victor ran outside, he saw defendant driving away. Victor called the police and filed a report. Later that night, defendant called Victor, admitted he broke the van window, and warned that people in the family would start "dropping like flies" if Victor did not divulge Yolanda's whereabouts. Defendant returned that night. As defendant was walking towards Victor's front door, Victor saw him pull out a gun and immediately closed the door. Defendant walked back to his car and drove away. Over the next several weeks, defendant continued to call Victor often, threatening to kill people in his family if he did not find out Yolanda's whereabouts.

Yolanda's sister, Lucinda Buttler, testified that Yolanda spoke of leaving defendant for two years. During the last year or two of their relationship, Yolanda explained that defendant was abusive to her. Lucinda once saw defendant push Yolanda out of their mother's house. Yolanda would often call Lucinda secretly because defendant did not want the sisters to talk with or see each other.

The day after Yolanda moved out, defendant went to Lucinda's house and asked where Yolanda was. When Lucinda replied she did not know, defendant warned that if Yolanda did not show up, he would start killing her family members one by one. He told Lucinda what he had done to Victor so that she would take his threats seriously.

11

## B.  Penalty Phase

### 1. *The Prosecution's Case*

Because the penalty phase was tried before a different jury than the guilt phase, the prosecution presented much of the guilt phase evidence, relating to defendant's history with Yolanda and the circumstances of the crime — at the penalty phase.  That evidence included defendant's abusive and controlling behavior towards Yolanda, the December 30, 1996 incident, which was the subject of Yolanda's restraining order, defendant's visits to the homes of Yolanda's siblings after Yolanda left him, his threats to her siblings when he was trying to locate Yolanda, and expert testimony on the burns suffered by Yolanda.

Other evidence presented at the penalty phase included the testimony of another of Yolanda's brothers and additional testimony by Yolanda's brother, Victor.  Rallin Buttler, another brother, testified that after Yolanda moved out, defendant made threatening calls to Rallin and his mother, who lived in Rallin's house.  Defendant called Rallin's mother names and threatened to do bodily harm to her and her family if she did not disclose Yolanda's whereabouts.  Defendant threatened to kill Rallin, to "take" him and his entire family "out" if they refused to give the location of Yolanda, and to "blow away" anyone who got in his way, including Yolanda.  Defendant said that when he found Yolanda, she was going to regret it.

Rallin testified that on January 4, 1997, he and his family were awakened by a loud banging on the front door.  Rallin heard the shattering of his front window and saw defendant driving away in defendant's car.  Rallin saw 10-15 dents in his front door that appeared to have been made by a gun.

Victor Buttler testified that Yolanda told him she was afraid of defendant and that he had threatened to kill her if she ever left him.

12

The prosecution also presented evidence that defendant had pleaded guilty to felony assault with a deadly weapon (§ 245, subd. (a)(2)) on February 18, 1997 for the gun incident at Victor's house and had also been convicted of shooting at an inhabited dwelling (§ 246) in 1982, a misdemeanor. On the felony assault conviction, defendant was placed on probation. Regarding the conviction for shooting at an inhabited dwelling, the prosecution presented evidence of the underlying circumstances. Defendant had followed Paul Triplett, a man who was dating the mother of one of defendant's children, and they got into a physical altercation. After the fight, defendant fired a shotgun into the house Triplett had entered. The shot shattered the window in a room in which an infant lay in a bassinet. No one was hurt.

The prosecution presented victim impact evidence, including the severe emotional trauma Little Howie and the other children suffered and the behavioral problems they were still exhibiting.

### 2. *The Defense Case*

Defendant presented testimony from his mother and a neighbor who portrayed defendant as a devoted father, son, and boyfriend. Defendant's mother testified that Little Howie did not experience traumatic shock from his mother's death or act differently after she died.

Defendant testified in detail about his loving relationship with Yolanda, his desperation when she left him, his use of drugs and alcohol before the crime, and his writing the suicide note as a ploy to get Yolanda back, not as an expression of his intent to kill her. He denied that he threatened Yolanda's family members or used a gun at her brothers' houses. As in the guilt phase, defendant testified in detail about the events leading up to the murder, including his phone calls to Yolanda, his prior meeting with Yolanda and the children, the fight between him

13

and Yolanda at the Chuck E. Cheese in Fontana, and his lack of memory regarding his pouring gasoline on Yolanda and setting her on fire.  He denied that he intended to kill or hurt Yolanda.  Also, as in the guilt phase, defendant testified that on December 30, 1996, he only pulled Yolanda's braided hair extensions so that she would come to bed.

Defendant explained that as expressed in his note to Yolanda, he intended to kill himself, but had no idea how, though the possibility of a police chase or police shooting occurred to him.  He wanted to have someone else kill him because he is Christian and wanted to go to heaven.  He was sorry for what he had done to Yolanda, but that because his life belongs to the Lord Jesus Christ and if God gives him the opportunity, he will make it up by leading other inmates in the right direction.

### 3. Rebuttal

The People's rebuttal consisted primarily of defendant's statements during the booking process, and to three psychologists who examined him during the pendency of the case.

During the booking process, defendant made a spontaneous statement that his "ex-wife" had broken up with him in January, she had packed up the children and moved to Victorville, she had ruined his life, and he wanted to ruin her life.

In a statement to one of the psychologists, defendant admitted that he threatened Yolanda's family.  In statements to two psychologists, defendant described how he had set Yolanda on fire.  In one statement, defendant described that he had splashed Yolanda with gasoline, but claimed that he lit the lighter only to scare her.  A bystander grabbed his hand, causing him to flick the lighter and ignite the gasoline.  In another statement, defendant stated that he and Yolanda had argued over Little Howie and that Yolanda started scratching and hitting

14

defendant.  Defendant removed the gasoline from his car, doused her with it, then lit a cigarette lighter, which led to her being burned.

## II.  DISCUSSION

### A.  Jury Selection Issue

*Peremptory Challenges*

Defendant claims that during voir dire of the penalty phase retrial, the prosecutor improperly exercised peremptory challenges against three African-American prospective jurors on the basis of race.  (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).)  Defendant is and the victim was African–American.  The applicable law is well settled. Under *Wheeler*, " '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds — violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution.  [Citations.]' " (*People v. Hawthorne* (2009) 46 Cal.4th 67, 77-78.)  Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment.  (*Batson*, *supra*, 476 U.S. at p. 88; *People v. Hawthorne*, *supra*, 46 Cal.4th at p. 78.)

In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure.  "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'  [Citations.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial

15

court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted (*Johnson*).)

Without objection from defense counsel, the prosecutor exercised his third peremptory challenge to excuse Prospective Juror No. 3 and his fourth peremptory challenge to excuse Prospective Juror No. 44. After the prosecutor used his fifth and final challenge to excuse Prospective Juror No. 46, defense counsel made a *Wheeler/Batson* motion because the prosecutor had excused three prospective jurors who were African–American. At the time of the motion, seven African-Americans had been called to the jury box. The prosecutor peremptorily excused three of them, while the defense peremptorily excused two of them. Two African-American prospective jurors remained in the jury box.

In support of his motion, defendant argued that the prosecutor used his last three peremptory challenges to "systematically eliminat[e] Black jurors." When the trial court noted that the defense peremptorily challenged two African-American prospective jurors, defense counsel explained that he was justified in those excusals, and that they had come after the trial court denied his challenges to them for cause. The trial court responded, "I don't think there is any dispute that you had a valid reason in your mind and your client's mind to excuse the two. You did. That is not an issue, really."

The prosecutor argued that defendant failed to make a prima facie showing and offered to relate his concerns regarding Prospective Juror No. 44. The trial court responded, "If you wish." The prosecutor commented that she had a BA in sociology, and had "done social work and nursing all of her life." The prosecutor further commented that her questionnaire answers indicated that although some murders may be intentional, the fact they are committed by a person who is temporarily insane or emotional might affect her decision regarding imposition of

16

the death penalty. The prosecutor explained that "given the facts of this particular case, I don't think that juror could ever actually render the death verdict given what we know to be the facts of our case." The prosecutor also expressed concern with Prospective Juror No. 44's demeanor, noting that she appeared to be distant when the other prospective jurors responded to questions and appeared to be a "loner," which could lead to a hung jury.

The prosecutor pointed out that he and defense counsel stipulated to several excusals for cause, including two African-American prospective jurors who could not be impartial, and that he argued vigorously to retain the two Black prospective jurors that had been challenged by the defense for cause, but that the defense used its peremptory challenges against them. The prosecutor asserted that he challenged the African-American prospective jurors "for reasons having nothing to do with skin color."

The trial court denied defendant's motion, finding there was an insufficient showing of a prima facie case.

Defendant argues that although the trial court did not state which standard it was using, it presumptively used the wrong standard, i.e., whether defendant established a "strong likelihood" that a juror has been peremptorily challenged on the basis of group bias. (*Wheeler*, *supra*, 22 Cal.3d at p. 280.) After the trial in this case, the high court disapproved that standard for purposes of a defendant's establishing a prima facie case. (*Johnson*, *supra*, 545 U.S. at pp. 166-168.) Under *Batson*, the court stated that the prima facie burden is simply to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson*, *supra*, 545 U.S. at p. 170.) In addition, defendant claims that in finding no prima facie showing, the trial court relied on irrelevant grounds.

17

Regardless of the standard or considerations used by the trial court, we have reviewed the record independently (applying the high court's standard) to resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race. (*People v. Hawthorne*, *supra*, 46 Cal.4th at p. 79.) We conclude that the record does not support such an inference.

In establishing a prima facie showing, a defendant has the burden of demonstrating that the facts and circumstances of the case raise an inference that the prosecutor excluded prospective jurors based on race. (*Batson*, *supra*, 476 U.S. at p. 96.) Notably, defendant's only stated basis for establishing a prima facie case at trial was that the prosecutor exercised three of five peremptory challenges against African-American jurors. Defendant attempts to buttress that stated basis by arguing on appeal that 28 percent of the prospective jurors called to the jury box were African-American, while the prosecutor used a disproportionate ratio of his strikes (60 percent) against African-Americans. However, defendant's numerical showing falls short of a prima facie case. (*People v. Clark* (2011) 52 Cal.4th 856, 905 [no prima facie case where prosecutor challenged four of five African-American prospective jurors ]; *People v. Cornwell* (2005) 37 Cal.4th 50, 70 [no prima facie case where prosecutor challenged one out of two African-American prospective jurors]; *People v. Yeoman* (2003) 31 Cal.4th 93, 115 [prima facie case not established by cursory reference to prosecutor's strike of three prospective jurors by name, number, occupation and race]; *People v. Farnum* (2002) 28 Cal.4th 107, 136-137 [prima facie case not established by asserting prosecutor exercised four of five peremptory challenges against Black prospective jurors]; *People v. Adanandus* (2007) 157 Cal.App.4th 496, 503-504 [no prima facie case established by asserting prosecutor exercised three peremptory challenges against Black prospective jurors].)

18

The totality of the relevant facts of voir dire refutes an inference of discriminatory purpose. (*People v. Clark*, *supra*, 52 Cal.4th at p. 905; *People v. Gray* (2005) 37 Cal.4th 168, 186.) Before he exercised a single peremptory challenge against an African-American juror, the prosecutor accepted the jury four times with up to three African-American prospective jurors seated in the jury box. During the first three times, the prosecutor accepted the jury with two African-American prospective jurors (Nos. 3 and 23) seated.

Another African-American prospective juror (No. 35) came into the jury box to replace an excused juror. Defense counsel challenged Prospective Juror No. 35 for cause. The prosecutor opposed the challenge and questioned the juror in an attempt to rehabilitate him. The trial court denied defendant's challenge for cause.

The prosecutor accepted the jury a fourth time with three African-American prospective jurors (Nos. 3, 23, and 35) seated. At that point, defense counsel did not peremptorily challenge Prospective Juror No. 35, but used his fifth peremptory challenge against another prospective juror. That juror was replaced with Prospective Juror No. 42, who was African-American. The prosecutor then used his third peremptory challenge against Prospective Juror No. 3, which was his first peremptory challenge against an African-American juror. Prospective Juror No. 3 was replaced with Prospective Juror No. 43, who was also African-American.

Defense counsel challenged Prospective Juror No. 43 for cause. The prosecutor opposed the challenge and questioned the juror in an attempt to rehabilitate him. The trial court again denied defendant's challenge for cause.

Defense counsel exercised his sixth peremptory challenge against Prospective Juror No. 43, who was replaced by another African-American prospective juror (44). The prosecutor exercised his fourth peremptory challenge against Prospective Juror No. 44, which was his second peremptory challenge

19

against an African-American juror. Prospective Juror No. 44 was replaced by another African-American juror (No. 46), leaving four African-American jurors seated in the jury box. After defense counsel exercised his seventh peremptory challenge, the prosecutor accepted the jury a fifth time, with those four African-American jurors (Nos. 23, 35, 42, and 46) seated. Defense counsel used his eighth peremptory challenge against Prospective Juror No. 35. The prosecutor used his fifth peremptory challenge against Prospective Juror No. 46, leaving two African-American prospective jurors seated in the jury box (Nos. 23 and 42). Defendant then made a *Wheeler/Batson* motion.

After the trial court denied the motion, defense counsel exercised his ninth and final peremptory challenge against Prospective Juror No. 42, his third peremptory challenge against an African-American prospective juror. Prospective Juror No. 23 was the only African-American juror who sat on the final penalty phase jury.

Thus, the record reflects that before defendant made the *Wheeler/Batson* motion, the prosecutor accepted the jury five times with up to four African-American prospective jurors seated in the jury box. The prosecutor accepted the jury four times with Prospective Juror No. 3 seated and one time with Prospective Juror No. 46 seated before finally excusing them. (*People v. Clark*, *supra*, 52 Cal.4th at p. 906 [no prima facie case where prosecutor passed two African-American jurors during several rounds before finally excusing them].) The prosecutor's acceptance of a panel including African-American prospective jurors, while not conclusive, was " 'an indication of the prosecutor's good faith in exercising his peremptories, and . . . an appropriate fact for the trial judge to consider in ruling on a *Wheeler* objection . . . .' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 487.) The record also reflects that there was an African-American on the jury panel ultimately sworn, and the prosecutor repeatedly passed that juror on

20

his peremptory challenges. (*People v. Clark*, *supra*, 52 Cal.4th at p. 906; *People v. Cornwell*, *supra*, 37 Cal.4th at p. 70; *People v. Adanandus*, *supra*, 157 Cal.App.4th at pp. 503-504.) It further reflects that after extensive questioning, the prosecutor successfully rehabilitated two African-American jurors, Prospective Jurors Nos. 35 and 43, staving off defense challenges for cause. The prosecutor's desire to keep African-American jurors on the jury tended to show that the prosecutor was motivated by the jurors' individual views instead of their race. (*People v. Hartsch*, *supra*, 49 Cal.4th at p. 487.)

Finally, the record of voir dire shows race-neutral reasons for the prosecutor's excusals of Prospective Jurors Nos. 3, 44, and 46. Prospective Juror No. 3 was a married, 27-year-old woman with two children who worked for the San Bernardino County Department of Social Services as a social services caseworker. On the questionnaire, she stated that she "strongly disagreed" that anyone who intentionally killed another person should get the death penalty. She stated that if under certain circumstances, the person killed with "good reason" he or she "should be punished, but not put to death." She explained, "[w]hen I say good reason, I mean in their minds." Prospective Juror No. 3 further stated that "maybe" the death penalty was appropriate in cases where a person of sound mind admits to death and commits willful acts of cruelty, such as execution-style or gang murders.

From Prospective Juror No. 3's responses, the prosecutor could have reasonably been concerned with her emphasis on the killer's subjective perspective, especially in a case such as this one, where the defense would be that the defendant snapped under extreme emotional despair and did not intend to kill. Her responses also indicated a willingness to impose the death penalty only under very limited circumstances and if the defendant confessed, facts not present in this case. As with Prospective Juror No. 44, the prosecutor could also have reasonably

21

believed that as a social services caseworker, Prospective Juror No. 3 might be more sympathetic to the defense. (*People v. Clark*, *supra*, 52 Cal.4th at p. 907 [peremptory challenge properly based on juror's experience in counseling or social services]; *People v. Landry* (1996) 49 Cal.App.4th 785, 790-791 [peremptory challenge properly based on juror's educational background and experience in psychiatry or psychology].) )

Prospective Juror No. 44 was a 63-year-old widow with grown children, who worked for San Bernardino County as a supervising social worker. She graduated from college with a BA in sociology and was a social worker for 30 years. On the questionnaire, she stated that she had served 30 days in custody for committing credit card fraud 30 years earlier and had visited her husband in jail for drunk driving. She indicated that her decision to impose the death penalty might be affected where an intentional murder is "so emotional," or the person is temporarily insane.

Other than the prosecutor's concerns with the juror's demeanor, the record supports his stated concerns regarding Prospective Juror No. 44's employment as a social worker, and her unwillingness to impose the death penalty in cases such as this one involving a defense centered on defendant's emotional instability.

Prospective Juror No. 46 was a married, 44-year-old woman with three children, who worked for the Los Angeles County Department of Public Health as an eligibility worker and Medi-Cal liaison. On the questionnaire, she indicated she had not thought much about the death penalty, could not think of a general purpose it would serve, and believed that life imprisonment was a harsher penalty than death. Prospective Juror No. 46 strongly disagreed that anyone who intentionally kills another person should automatically get the death penalty. When asked if she could impose the death penalty in an appropriate case, she answered "possibly."

22

From Prospective Juror No. 46's responses, the prosecutor could have reasonably concluded that she was uncertain about her ability or willingness to impose the death penalty, even in the most extreme cases. Also, as with Prospective Jurors Nos. 3 and 44, the prosecutor could have reasonably been concerned with Prospective Juror No. 46's employment in the social services field. Thus, the record discloses race-neutral reasons for the excusals.[5]

Because defendant failed to meet his burden of establishing a prima facie case of group discrimination, the trial court correctly denied his *Wheeler/Batson* motion.

## B. Pretrial Issues Regarding Penalty Phase

### *1. Denial of Defendant's Marsden Motion*

Defendant claims that the trial court improperly denied his motion to replace appointed counsel at the penalty phase retrial, resulting in a violation of his federal and state constitutional rights. The trial court did not abuse its discretion in denying defendant's motion.

#### *a. Facts*

On August 27, 1998, during jury selection for the guilt phase of trial, defendant made his first motion to substitute Defense Counsel Robert Amador. The trial court held a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.

---

[5]    For the first time on appeal, defendant asks us to conduct a comparative analysis regarding the prospective jurors' responses and the prosecutor's questioning of them. Here, the trial court did not ask the prosecutor for his reasons for the excusals or rule on the prosecutor's actual reasons for excusing Prospective Juror No. 44. (See *People v. Mills* (2010) 48 Cal.4th 158, 174, fn. 3; *People v. Hawthorne, supra*, 46 Cal.4th at p. 79, fn. 2.) Because the trial court determined there was no showing of a prima facie case, we decline to conduct a comparative juror analysis in this " 'first-stage' " *Wheeler/Batson* case. (*People v. Hawthorne, supra*, 46 Cal.4th at p. 80, fn. 3.)

Defendant stated that, although counsel had been assigned at the beginning of the case, defendant had not seen any police reports or documents and was unaware of his defense. He believed that Amador was not prepared because he had not filed a written response to one of the prosecution's motions, but had only responded verbally. When defendant stated he believed counsel was not adequately defending him, the trial court asked him to provide specific examples of what he wanted Amador to do that he had not done. Defendant responded that the prosecution's motions contained "lies" and he wanted Amador to challenge the truthfulness of the evidence. The court noted that defendant had not proffered any facts to support his claim. It stated that defendant had not provided a reason for relieving Amador, but appointed independent counsel to provide assistance to defendant on the *Marsden* motion.

On August 31, 1998, at the next hearing on the *Marsden* motion, Charles Nacsin, who had been appointed to assist on the motion, announced that defendant wanted to withdraw the motion. Defendant told the court that after speaking with Amador, his concerns had been resolved and he understood what Amador was doing.

On September 21, 1998, the jury returned guilty verdicts and true findings on the special circumstances. On October 14, 1998, the jury advised the court it could not reach a verdict on the penalty; the trial court found the jury was hopelessly deadlocked and declared a mistrial on the penalty phase of trial.

On November 2, 1998, during jury selection for the first penalty phase retrial, Defense Counsel Amador moved to be relieved as counsel.[6] Amador

---

[6] On November 25, 1998, the trial court discharged the jury after granting defendant's motion for a continuance. Defendant's second penalty phase retrial began on January 19, 1999.

stated he was concerned that another attorney had been visiting defendant in jail, that this would interfere with his representation of defendant, and that defendant refused to provide Amador reasons for the visits. A jail log revealed that Attorney David Karlson had visited defendant nine times from July 25, 1998 to October 28, 1998. Defendant denied that Karlson was interfering with Amador's representation. He explained that Karlson had said there was nothing he could do for defendant on his case until after the penalty phase ended. Defendant felt that because Amador did not want to represent him, he too did not want Amador representing him. Amador clarified that he was not currently asking to be relieved, but that if Karlson's jail visits continued, he would ask to be relieved. The court issued an order to show cause against Karlson and appointed Attorney Nascin to consult with defendant regarding the need for a *Marsden* motion.

On November 4, 1998, the trial court held a hearing regarding Attorney Karlson's jail visits with defendant. Karlson testified that defendant asked to speak with him after the jury hung on the penalty verdict. On October 28th, Karlson visited defendant briefly and told him that because defendant was already represented, he could not advise him on the case until after the trial and his attorney-client relationship with Amador had ended. Karlson assured the court he would follow its order barring any future contacts with defendant. Attorney Nascin then requested a *Marsden* hearing; after talking with defendant, he felt that there was a breakdown in the relationship between defendant and Amador.

On the following day, the trial court held a *Marsden* hearing, with Nascin representing defendant. Defendant initially testified that he had lost confidence in Amador for two reasons. First, Amador had asked to be relieved as counsel. Second, Amador had failed to respond to his requests during the guilt phase to pursue other evidence and to ask witnesses certain questions. When asked about his first *Marsden* motion, defendant explained that he had withdrawn the motion

25

after Amador assured him things would be better and that "he had stuff up his sleeves he was going to bring out." But, as the trial progressed, defendant felt that Amador was not fighting for him and giving him "100 percent," and that he did not receive a fair trial.

Defendant testified that his feelings about Amador "really changed" when the trial court dismissed the jury after its penalty deadlock. He had questions on what was going to happen next, but could not reach Amador by telephone. Defendant was told that Amador had gone to Reno and would return the following morning. But, Amador did not call or visit him during the two-week period after the mistrial. Because he and his family were concerned about the future proceedings, defendant contacted Karlson for information, but Karlson did not provide any answers. Defendant stated that he lost confidence in Amador because he felt that if Amador was professional and had been doing a good job, he would not have been concerned about defendant's contacts with Karlson. Defendant also questioned why Amador had advised him not to testify and why he told the court of that advisement, even though defendant wanted to testify. Finally, defendant stated he felt that there was no communication between him and Amador.

Amador testified that on defendant's suggestion, the defense team spoke to several witnesses. Because several of these witnesses had "nothing good to say" about defendant, they determined that these witnesses would have caused more harm to defendant's case. For example, one witness related that a few days before he burned Yolanda, defendant wanted to borrow a handgun. Amador denied that he told defendant that he had "something up" his "sleeve."

Amador testified that because defendant did not want him as his lawyer and did not like Amador, he felt uncomfortable and did not want to represent defendant. Amador felt that their relationship had broken down and was irreparably harmed. Because defendant refused to tell him why Attorney Karlson

26

was visiting him so often, Amador felt that defendant was not candid and did not cooperate with him. However, Amador believed that if defendant was counseled to cooperate and communicate with him, Amador could still try the case. His personal feelings would not detract from his professional representation of defendant.

On the adequacy of Amador's representation, the trial court found that defendant's complaints about his failure to pursue certain matters and his unpreparedness were not specific enough, and that counsel's advice to defendant not to testify was an insufficient showing of ineffective representation. Regarding Amador's failure to see defendant after the penalty mistrial, the court noted that the quality of representation does not depend solely on the number of times a defendant speaks with his attorney. It commented that throughout the proceedings in this case, Amador conducted the defense appropriately, was prepared, and argued persuasively. It saw nothing unfair about the trial. The court noted that given the evidence and defendant's confession at the guilt phase, defendant could not have expected a not guilty verdict. The court further noted that, at the first penalty trial, Amador was able to convince a jury to hang on the verdict.

The trial court found that "what we have here, very unfortunately, is a personal relationship that has broken down." The court noted that Amador asked to be relieved based only on his perception that defendant had been consulting another attorney, who might have been "second-guessing" Amador's representation of defendant. The court further noted that defendant "joined in" Amador's motion, but did not initiate the motion for relief. It was only at that point that defendant lost confidence in Amador's ability to defend him.

Despite their personal relationship, the trial court denied Amador's and defendant's motions for relief of counsel because there was not an irreconcilable conflict and there was no showing of ineffective representation. The court

27

accepted Amador's representation that his personal feelings would not influence or affect his ability to professionally represent defendant and advised defendant to cooperate and communicate with his attorney.

### b. Discussion

"When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden*, *supra*, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44, 'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) "A trial court should grant a defendant's *Marsden* motion only when the defendant has made 'a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1025.)

"We review the denial of a *Marsden* motion for abuse of discretion." (*People v. Taylor*, *supra*, 48 Cal.4th at p. 599.) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*Ibid.*)

We conclude that defendant has failed to establish that the trial court abused its discretion in denying his *Marsden* motion. Although defendant emphasizes that Amador failed to communicate with him, defendant's testimony reveals that this claim was based primarily on counsel's failure to speak with him during the two-week period between the penalty phase mistrial and the motions for relief of counsel. Although not answered immediately, defendant's questions about the upcoming proceedings presumably were answered later. Similarly,

28

defendant's lack of confidence in Amador was based primarily on counsel's failure to communicate with defendant during that two-week period and on counsel's request to be removed.  However, as the trial court explained, "the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence."  (See *People v. Silva* (1988) 45 Cal.3d 604, 622.)  After presiding over the guilt phase trial and the first penalty phase trial, the court noted that counsel had performed adequately and accepted counsel's representation he could continue to represent defendant professionally.  Although defendant now points to some of Amador's actions as specific examples of a "rather tepid" performance throughout the case, he failed to raise those claims to the trial court.  In any event, tactical disagreements between a defendant and his attorney or a defendant's frustration with counsel are not sufficient cause for substitution of counsel.  (*People v. Jackson* (2009) 45 Cal.4th 662, 688; *People v. Barnett* (1998) 17 Cal.4th 1044, 1092.)

On this record, the court reasonably concluded that defendant failed to show counsel provided inadequate representation or that any conflict between defendant and Amador was irreconcilable.  There was no abuse of discretion.

### 2. *Absence of Defense Counsel and Presence of Substitute Attorney During Portion of Jury Selection At Penalty Phase Retrial*

Defendant claims that the absence of his attorney and the presence of substitute counsel during the distribution of juror questionnaires and hardship screening at the penalty phase retrial deprived him of his right to counsel under the federal and state constitutions.  He is wrong.

On January 19, 1999, the first day of the second penalty phase retrial (third penalty phase trial), Attorney Amador was not present in court because of illness.  Another attorney, Julian Ducre, was present to represent defendant during Amador's absence.  The trial court asked defendant if somebody spoke to him

29

"about the situation with Mr. Amador." Defendant replied yes. The court explained that during the proceedings in Amador's absence and Ducre's presence, "nothing will happen regarding the presentation of your case or the prosecution's case except to explain to the jury the procedure and hand out the questionnaires and have them returned on a later date." When asked if he would consent to that procedure, defendant replied yes.

During Ducre's presence, three groups of prospective jurors were called into the courtroom and sworn. The first group appeared on the morning of January 19. The second group was brought in that afternoon, while the third group came in on the following morning. During all three sessions, the trial court introduced the parties, read the information, related that Attorney Ducre would be sitting in that day because defendant's attorney, Amador, was ill, and explained the proceeding was a penalty phase trial. It discussed the jury selection procedure and schedule, including the fact that questionnaires would be distributed, and the prospective jurors would be dismissed and ordered to return on February 1st with the completed questionnaires. After the questionnaires were distributed, the court explained the grounds for a hardship excusal. The court asked those prospective jurors claiming hardship to stay and dismissed the other prospective jurors. After questioning, the court dismissed those prospective jurors who had been excused by stipulation.

After the above proceedings, the trial court ordered the prosecutor to meet with Amador to discuss the questionnaires and return to court on February 1. On that date, Amador was present in court when the first group of prospective jurors returned with their completed questionnaires.

The Attorney General claims that defendant cannot challenge his attorney's absence because he consented to Amador's absence and the substitution of Attorney Ducre. Defendant responds that defendant agreed to have stand-in

30

counsel only for the purpose of handing out the jury questionnaires and was not advised that the court would be excusing prospective jurors for hardship in Amador's absence. Defendant argues that, under these circumstances, he did not waive his right to have his attorney present during the excusal proceedings. Because we conclude that defendant was not deprived of his right to counsel, we need not decide the waiver issue.

On the merits, defendant contends that the absence of Amador during jury selection proceedings constituted a "structural error" that requires automatic reversal of the judgment without reference to harmless error analysis. (*Arizona v. Fulminate* (1991) 499 U.S. 279, 309.) Alternatively, he argues that Amador's absence was a presumptively prejudicial violation of his right to counsel at a critical stage of the proceedings. (*Bell v. Cone* (2002) 535 U.S. 685, 695-697; *United States v. Cronic* (1984) 466 U.S. 648, 659.)

"A criminal defendant enjoys the right to counsel under both the state and federal Constitutions (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, *Gideon v. Wainwright* (1963) 372 U.S. 335, 339-345, *People v. Koontz* (2002) 27 Cal.4th 1041, 1069, 119 Cal.Rptr.2d 859, 46 P.3d 335.) A complete denial of counsel at a critical stage of the proceedings, including during jury voir dire (*Gomez v. United States* (1989) 490 U.S. 858, 873), gives rise to a presumption that the trial was unfair. (*Cronic*, *supra*, 466 U.S. at p. 659). But when the defendant is represented by counsel, the presumption of prejudice will only stand when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing. (*Bell v. Cone* (2002) 535 U.S. 685, 695; *Cronic*, at p. 659.)" (*People v. Benavides* (2005) 35 Cal.4th 69, 86.)

We reject defendant's claims for several reasons. First, because defendant had an attorney representing him at all times during the jury selection proceedings, there was not a complete denial of counsel, let alone "structural error." (*People v.*

31

*Benavides*, *supra*, 35 Cal.4th at p. 86 [defense cocounsel's conducting of voir dire in absence of lead counsel not a violation of right to counsel]; *Carroll v. Renico* (6th Cir. 2007) 475 F.3d 708, 712-713.)

Second, we question whether Amador's absence and Ducre's presence occurred during a critical stage of the proceedings. Hardship screening of the jury pool is not a critical stage of the proceedings. (*People v. Ervin* (2000) 22 Cal.4th 48, 72 [defendant had no absolute right to be present during hardship screening]; *People v. Basuta* (2001) 94 Cal.App.4th 370, 395-396 [jury commissioner's screening of jury pool for financial hardship in absence of defense counsel or defendant not constitutionally significant].) Here, the court's hardship screening and distribution of juror questionnaires bore " 'no reasonable, substantial relation to [defendant's] opportunity to defend the charges against him' " (*People v. Ervin*, *supra*, 22 Cal.4th at p. 74), nor was there even an opportunity for counsel to subject the prosecution's case to meaningful adversarial testing during the preliminary portion of the jury selection process. (*Bell v. Cone*, *supra*, 535 U.S. at p. 695; *United States v. Cronic*, *supra*, 466 U.S. at p. 659.) Thus, defendant was not presumptively prejudiced by Amador's absence.

Moreover, defendant has failed to show he was actually prejudiced. Defendant argues that Amador's presence was necessary because he "had an awareness of trial strategy and an understanding of the unique aspects of the case." Hardship excusals " 'are to be granted only on a sufficient showing that the individual circumstances of the prospective juror make it unreasonably difficult for the person to serve or that hardship to the public will occur if the person must serve in the particular case.' " (*People v. Tate* (2010) 49 Cal.4th 635, 663.) The propriety of a hardship excusal does not depend on the underlying facts of the specific case, but rather on the juror's individual circumstances of hardship in

serving on a jury in general. Thus, intimate knowledge of the case is not necessary for counsel's effective representation during hardship excusals.

Defendant contends that stand-in counsel failed to object to the trial court's use of a more lenient standard for hardship excusals than designated in California Rules of Court, rule 2.1008. For example, he argues that financial hardship excusals were granted by the court or by stipulation without a showing that there was an "extreme" burden (Cal. Rules of Court, rule 2.1008(d)(3)) and were granted to full-time students and those with planned vacations, criteria not designated in the rules of court. However, as the Attorney General argues, even if Attorney Amador had been present, the result would have been the same. As she points out, in the first trial, Amador stipulated to the excusal of jurors who requested a hardship dismissal on the same grounds defendant now claims were too permissive. Moreover, there is no showing that any of the hardship excusals were improper or an abuse of discretion. "[R]ule 2.1008's strictures on the jury commissioner's authority to issue hardship excusals do not necessarily apply to hardship excusals granted by the trial court during voir dire." (*People v. Tate*, *supra*, 49 Cal.4th at p. 665, fn. 18.) Defendant has failed to show that any of those excusals resulted in the seating of biased jurors or that the panel from which persons were excused for hardship reasons was less than representative. (See *People v. Tate*, *supra*, 49 Cal.4th at p. 663, fn. 16.)

Finally, defendant argues that Attorney Ducre failed to object when the trial court stated that because a previous jury had determined defendant's guilt and the truth of the special circumstances, it "will not be something that you will have to concern yourself with." He claims that he was prejudiced because the statement undermined the concept of lingering doubt. As discussed below, the trial court's statement was not incorrect. (See *post*, pp. 77-79.) Moreover, as the Attorney General points out, it was likely that Amador himself would not have objected.

33

Amador did not object when the trial court gave the same information to prospective jurors before the start of the first penalty phase retrial.

Accordingly, the presence of a substitute attorney during the preliminary stage of jury selection was not a denial of defendant's right to counsel.

## C. Guilt Phase Issues

### 1. *Admission of Photographs, Expert Testimony About the Nature and Degree of the Victim's Burns, and Tape Recording of Victim in the Ambulance*

Defendant contends that the trial court committed prejudicial error by admitting photographs of the victim's injuries, expert testimony about the nature and extent of the burns she suffered, and a tape recording of Yolanda's screams in the ambulance while she was transported to the hospital. He argues that admission of this evidence, individually and collectively, violated California law and his federal constitutional rights to a fair trial and a reliable, nonarbitrary adjudication of all stages of a death penalty case. As explained below, the trial court properly admitted the evidence.

#### a. Photographs

The prosecutor sought admission of five photographs of various parts of the victim's body to show the burn injuries that she had sustained. He represented that Dr. David Vannix, the prosecution's burn expert, chose the five photographs as necessary to support his expert opinion. Defendant objected that the photographs were irrelevant and tended to inflame the jury (People's Exhibits Nos. 8-12). The prosecutor argued that the photographs were relevant to establish malice and on the issues relating to torture murder as well as the torture special circumstance. The trial court admitted three of the five photographs (People's Exhibits Nos. 8-10) to show the severity of the burns and the victim's pain and suffering. It explained that the three admitted photographs showed different

34

portions of the victim's body and thus, different areas of injury on the body. Exhibit No. 8 showed the lower portion of the victim's front torso. Exhibit No. 9 showed the victim's back torso. Exhibit No. 10 showed the victim's front, her upper torso and face. The court excluded exhibits Nos. 11 and 12 as cumulative because they duplicated the areas of the body shown in exhibits Nos. 8-10.

### b. *Expert Testimony*

Defendant moved to exclude admission of the expert testimony of Dr. Vannix and other evidence relating to the victim's pain and suffering. Defense counsel argued that the evidence was irrelevant to any disputed issue since he admitted during opening statement that defendant had caused Yolanda's death and that she suffered a horrible, painful death. Regarding Dr. Vannix's testimony, defense counsel claimed the evidence was cumulative and not a proper subject for expert testimony. The prosecutor argued that the evidence was probative on the issues of malice and torture, and that the nature of the burns sustained by Yolanda was beyond the experience and understanding of the jury. The trial court denied defendant's motion, stating that the expert would assist the jury in determining the type of pain and suffering one would endure with this type of burning.

Deputy Medical Examiner Steven Trenkle testified that Yolanda's burns were consistent with burns from a gasoline fire. She suffered extensive second and third degree burns on her head behind her hairline, and on her entire face, the front of her chest, both arms, her back, and the top of both thighs. The pain inflicted from these types of burns could be severe and "potentially extreme."

Dr. Vannix, the medical director of the hospital and the victim's attending surgeon at the hospital's burn center, testified that Yolanda was admitted to the hospital in critical condition with life-threatening burn injuries. He explained how first, second, and third degree burns differed in appearance and in the severity of

pain.  First degree burns involve redness of the skin and some pain, but do not blister or peel.  With second degree burns from heat or flame, there are blisters and the skin usually appears red and is sometimes black from the ash or combustion.  Second degree burns involve injury to the deeper layer of dermis beyond the epidermis.  Third degree burns involve injury to the fatty tissue underlying the skin.  The skin is usually white and may or may not be blistered.  Unlike first and second degree burns, third degree burns "denature the skin's protein structure"; the skin is not elastic, but is thick, and feels heavy and leathery.

Dr. Vannix testified that because second degree burns cause injury to more nerve endings in the dermis than the epidermis, they are significantly more painful than first degree burns.  With third degree burns, the burns may not be painful initially, if none of the nerve endings survive.  In that case, the painlessness may be temporary until the nerve endings begin to regenerate.  Within 24 hours, someone with third degree burns feels the same or even worse pain than that associated with a second degree burn.  Such pain is extreme and "is among the most significant types of pain in human experience."

Dr. Vannix further testified that the paramedics were unsuccessful in administering pain medication to Yolanda.  Because the burns were so deep and the skin was so thickened, they were unable to find or gain access to a vein.  Jeffrey Boyles, a fireman who assisted in Yolanda's medical care during her transportation to the hospital, testified that Yolanda was in tears and screaming and went through the entire 20-minute ambulance trip without pain medication.  They tried to relieve the pain by pouring water over her burns.

### c.  Ambulance Tape

Defendant objected to the playing of a tape recording in which Yolanda was heard screaming during the ambulance ride to the hospital.  He argued that,

36

under Evidence Code section 352, the evidence was cumulative and unfairly prejudicial. Again, the prosecutor argued that the tape recording showed the degree of pain suffered by Yolanda, which was relevant to the issues relating to torture murder and to the torture special-circumstance allegation. The trial court overruled the objection, finding that the evidence was relevant. It found that although the tape recording was "to some extent" cumulative, it was a "different type of evidence," i.e., "a presentation of what was going on at the time, rather than somebody's verbal recitation of what they recall." The court further explained that it was relevant and material for the jury "to actually hear from the victim's own mouth expressions of the kind of pain that she was sensing as it goes to the issues in the lawsuit."

### d. Analysis

On appeal, defendant contends that admission of evidence of Yolanda's pain and suffering was irrelevant, cumulative, more prejudicial than probative, and violated his federal constitutional rights. Initially, we note that defendant did not object at trial to the expert testimony and the introduction of the ambulance tape on federal constitutional grounds. (*People v. Heard* (2003) 31 Cal.4th 946, 972, fn. 12 [failure to raise federal constitutional objection in trial court forfeits appellate claim].) To the extent his federal due process claim is merely a gloss on his objections in the trial court, it is preserved. (*People v. Partida* (2005) 37 Cal.4th 428, 437-438.) However, his claims are without merit.

We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 352, including photographic and tape-recording evidence. (*People v. Hawthorne*, *supra*, 46 Cal.4th at p. 103; *People v. Cole* (2004) 33 Cal.4th 1158, 1196, 1198.)

To prove torture murder, the prosecution must establish " 'a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' " (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)  To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. (*People v. Elliot* (2005) 37 Cal.4th 453, 479.)  The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.  (*People v. Chatman* (2006) 38 Cal.4th 344, 390.)

*People v. Cole*, *supra*, 33 Cal.4th 1158, is on point.  There, the defendant poured gasoline on the victim and set her on fire.  Like Yolanda, the victim in *Cole* sustained burns over 50 percent of her body, died 10 days later from severe respiratory problems, and had been in a violent, abusive relationship with her killer.  In *Cole,* we held that evidence of the victim's suffering — in the form of expert testimony and photographs — was relevant to prove intent to inflict extreme pain, required for both murder by torture and the torture-murder special circumstance, and to prove the commission of an act calculated to cause extreme pain, required for the torture-murder special circumstance.  (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1196-1199.)

Defendant argues that *Cole* is distinguishable because it is a pre-Proposition 115 case, while this is a post-Proposition 115 case.  He is correct that Proposition 115, effective June 6, 1990, eliminated " 'proof of the infliction of extreme physical pain no matter how long its duration' " as an element of the torture-murder special circumstance.  (*People v. Cole*, *supra*, 33 Cal.4th at p. 1197, fn. 7.)  Nevertheless, the evidence here, as in *Cole*, was relevant to prove intent to inflict extreme pain.  (See also *People v. D'Arcy*, *supra*, 48 Cal.4th at pp. 298-299

38

[photographs of burn victim relevant to prove intent to torture for torture murder]; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 211-212 [same]; *People v. Brasure* (2008) 42 Cal.4th 1037, 1054 [photographs of burn victim relevant to proof of how, when, and where victim was tortured and murdered]; *People v. Washington* (1969) 71 Cal.2d 1061, 1083.)  Moreover, the evidence showed the manner in which Yolanda was killed, which was relevant to the issue of intent to kill. (*People v. Ramirez* (2006) 39 Cal.4th 398, 454.)

As in *Cole*, we also find that the trial court did not abuse its broad discretion in admitting the evidence under Evidence Code section 352.  (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1197, 1199; see also *People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 212.)  Regarding the photographs, the court carefully reviewed each photograph and admitted only those photographs that it determined not to be cumulative.  As for the expert testimony, the court impliedly found the evidence was not cumulative and expressly found it was a proper subject for expert testimony.  The photographs were properly admitted to clarify the medical testimony of Dr. Vannix.  (*People v. Ramirez*, *supra*, 39 Cal.4th at p. 453; *People v. Brasure*, *supra*, 42 Cal.4th at p. 1054; see *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 299 [prosecution not obliged to prove how crime occurred solely from testimony of live witnesses].)  On the ambulance tape, the court expressly determined that the evidence was not cumulative because it was the victim's expression of pain and suffering at the time of the actual events.

Although defendant offered to stipulate to the cause and manner of death, he did not concede that he intended to inflict extreme physical pain on Yolanda. In any event, the prosecution may not be compelled to accept a stipulation where the effect would be to deprive the state's case of its persuasiveness and forcefulness.  (*People v. Arias* (1996) 13 Cal.4th 92, 131.)

39

Here, the evidence "did no more than accurately portray the shocking nature of the crimes. The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*People v. Ramirez*, *supra*, 39 Cal.4th at p. 454; see also *People v. Brasure*, *supra*, 42 Cal.4th at p. 1054 ["challenged photographs simply showed what had been done to the victim [doused with gasoline and burned]; the revulsion they induced is attributable to the acts done, not to the photographs"].) The record reflects that the trial court was aware of its duty to weigh the evidence's prejudicial effect against its probative value, and carefully did so. Because the evidence was properly admitted, we necessarily reject defendant's constitutional claims. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1197, fn. 8.)

### 2. *Admission of Yolanda's Declaration in Support of Temporary Restraining Order*

Defendant contends that the admission of Yolanda's declaration in support of the temporary restraining order against him violated the confrontation clause of the Sixth Amendment to the United States Constitution.

At trial, the prosecution moved to admit Yolanda's declaration under Evidence Code section 1370. The declaration stated:

"On December 30th, 1996, Howard went crazy. He took my braids and wrapped them around his hand. He had a very very tight grip on them. He kept pulling and pulling on my braids so hard he pulled my hair out of my head. When I would scream he told me to shut up and put his hand on my neck.

"All of this because I wouldn't have sex with him. When my daughter came to see what was happening he told her to leave, he said if she didn't leave she could stand there and watch.

40

"He would start drinking and get realy mean.  He push me out the house and lock the door.  He would throw things at me.  One time he held me down because I wouldn't give him my bank card.  He would push me around.  He would call me bitches and hores.  One time we went to Knotts Berry Farm he told me if I didn't leave with him, he would beat my ass and every one around us heard.  Some times he would make me give him my money and he would make me have sex with him."  (Errors in original.)

Defendant objected to the declaration's admission on the ground it would violate the Evidence Code and the confrontation clause.  The trial court granted the prosecution's motion and admitted the declaration at both the guilt and penalty phases of trial.

At the time of trial, the admission of extrajudicial hearsay statements of unavailable witnesses did not violate the confrontation clause if those statements fell within a firmly rooted hearsay exception or contained particularized guarantees of trustworthiness.  (*Ohio v. Roberts* (1980) 448 U.S. 56, 66.)  In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court overruled *Roberts*.  It held that "Where testimonial statements are at issue, . . . the Sixth Amendment demands what the common law required; unavailability and a prior opportunity for cross-examination."  (*Crawford v. Washington*, *supra*, 541 U.S. at p. 68.)

The Attorney General concedes that the declaration's statements — made under penalty of perjury and for the purpose of obtaining a judicial order against defendant —are testimonial, and there is no indication defendant had an opportunity to cross-examine Yolanda about these statements.  Nevertheless, the Attorney General argues that the statements were admissible under the rule of forfeiture by wrongdoing.  (*Giles v. California* (2008) 554 U.S. 353, 359-361 [forfeiture by wrongdoing not an exception to Sixth Amendment's right to

41

confrontation unless defendant engaged in conduct designed to prevent absent witness from testifying].) Defendant responds that the rule is inapplicable here because defendant did not engage in conduct designed to prevent the witness from testifying. We need not decide this question because any error in admitting the declaration was harmless beyond a reasonable doubt. (*Harrington v. California* (1969) 395 U.S. 250, 288.)

First, the declaration's statements merely corroborated testimony presented in the form of live witnesses. The prosecution presented extensive evidence of defendant's violent, abusive relationship with Yolanda at both phases of trial.

During the guilt and penalty phases, Yolanda's daughter, Lawanda, testified about the December 30, 1996 event, but in greater detail. She described that on that day, she was awoken by her mother's screams and saw defendant pulling on Yolanda's hair and dragging Shavonda by her leg brace in the presence of Little Howie. Defendant warned Lawanda that if she continued watching, he would pull Yolanda's hair harder. Defendant got on top of Yolanda. Because defendant's and Yolanda's pants were down, it appeared he was trying to do something "sexually." Defendant "tortured" Yolanda for hours. The next day, Yolanda's head was sore. Lawanda identified a photograph of her mother depicting the head injuries she suffered that night. Lawanda stated that before this incident, defendant continually threw things around the house, argued with and threatened Yolanda, and pushed her around.

Other witnesses provided further details about their relationship. During the guilt and penalty phases, Yolanda's sister, Lucinda Buttler, testified that she saw defendant push Yolanda out of the door when Yolanda did not want to leave the house after her father's funeral and that Yolanda told her defendant was abusive during the last year or two of their relationship. During the guilt phase, Yolanda's brother, Quentin Buttler, testified that he saw and photographed

42

Yolanda's head injuries in December 1996, which Yolanda attributed to defendant. Yolanda told Quentin that she was scared and wanted to leave defendant because he had been beating her. Quentin advised Yolanda to seek the restraining order. There was also evidence that defendant was controlling. He would not allow Yolanda to visit her siblings.

Second, the declaration described events separate from the charged incident. At the guilt phase, the trial court instructed the jury to consider the contents of the declaration for the limited purpose of showing malice and intent at the time he committed the charged crime. It further admonished the jury it was *not* to consider that evidence as showing defendant was a bad person or of bad character or was prone to commit acts of violence. Indeed, during the guilt phase closing argument, the prosecutor advised the jury that "we've put on a lot of evidence that may make the defendant sound like a bad guy. But you should not think of him as a bad guy . . . or convict him because you may not like him, may not think he's a good guy."

Finally, the evidence of the murder was overwhelming. After discovering that Yolanda had taken the children and left, defendant hunted her down; he went from one member of her family to the next, and angrily threatened to kill them. During the penalty phase, defendant stated that he wanted to ruin Yolanda's life because she had ruined his life and that she would regret leaving him. He carried out his threat in a horrific manner, first by pouring gasoline on Yolanda's car, where her disabled young niece was trapped in the backseat and then by pouring gasoline over Yolanda's body and setting her on fire in front of her children and others. Moreover, the note in the glove compartment of defendant's car reflects that defendant intended to kill Yolanda.

Any error in admitting Yolanda's declaration was harmless beyond a reasonable doubt.

43

### 3. Sufficiency of the Evidence

Defendant contends the evidence, in several respects, was insufficient to support the judgment. In reviewing a criminal conviction challenged as lacking evidentiary support, " 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.) The same standard of review applies to special-circumstance allegations. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise." (*People v. Combs* (2004) 34 Cal.4th 821, 849.)

### a. First Degree Murder Conviction; Torture and Lying-in-wait Special-circumstance Findings

The prosecution tried the case and the trial court instructed on three theories of first degree murder: (1) deliberate and premeditated murder; (2) torture murder; and (3) murder by lying in wait. Defendant contends that the evidence was insufficient to support the first degree murder conviction on any of these theories. He makes the same contention as to the special-circumstance findings. For the same reason, he also claims that the trial court improperly instructed the jury on each of the three theories of first degree murder. As explained below, we conclude that there was substantial evidence to support all three theories and the special-circumstance findings. Because we conclude substantial evidence supports a conviction of first degree murder based on theories of premeditation and deliberation, torture murder, and lying-in-wait, we necessarily reject defendant's additional claim that instructions on these theories were not justified by the evidence.

44

*1) Deliberate, Premeditated Murder*

Defendant contends that the prosecution presented insufficient evidence of premeditation and deliberation because none of the categories of evidence set forth in *People v. Anderson* (1968) 70 Cal.2d 15 were met in this case. In *Anderson*, we "identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "However, these factors are not exclusive, nor are they invariably determinative." (*People v. Combs*, *supra*, 34 Cal.4th at p. 850.) " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]' " (*People v. Bolin*, *supra*, 18 Cal.4th at pp. 331-332.)

As to planning and motive, defendant argues that although he was distraught about his failed relationship with Yolanda, the evidence showed only that he planned to meet with Yolanda, visit with his son, Little Howie, and try to win her back. He contends it does not show that he intended to kill her. As to the manner of killing, defendant argues that the evidence showed the killing was a rash, impulsive explosion of violence brought on by his having to wait for Yolanda, who was late. In so arguing, defendant primarily relies on his own testimony, and asks us to reject any incriminating inferences that the jury could have reasonably deduced from the prosecution's evidence.

The evidence in all three categories was overwhelming. The prosecution's evidence showed that defendant was controlling toward Yolanda, that he repeatedly physically abused Yolanda, and that Yolanda was afraid of him to the extent that she sought a restraining order against him and secretly left him and hid in a hotel instead of staying at her sister's house. When he was trying to find Yolanda and Little Howie, defendant went to the houses of Yolanda's siblings and

broke the window of a van, and threatened to kill members of Yolanda's family if they did not reveal her whereabouts. Victor Buttler testified that when defendant came to his house, he had a gun. Thus, defendant was furious with Yolanda for taking Little Howie and leaving, and was prepared to use violence to find her.

Indeed, the evidence showed that defendant planned to use violence against Yolanda. The police found a note written by defendant to his parents in the glove compartment of his car. In the note, defendant apologized for his death and asked his parents to raise his son, Little Howie, to tell him that he was "sorry" for what he did to Yolanda, and to warn him to "never fall in love" with a woman. He admitted that he knew what he did to Yolanda was wrong, but that she did not deserve "to live like me."

As he testified at trial, defendant argues that the note was simply a suicide note and that the reference to Yolanda did not mean that she did not deserve to live, but that she did not deserve to live the same lifestyle as defendant. However, the jury was entitled to reject defendant's explanation. Instead, it could have reasonably understood the note as expressing his belief that Yolanda did not deserve to live. In other words, it could have understood it as a murder-suicide note. Given the note's many grammatical and spelling errors, the jury could have reasonably believed that defendant omitted a comma and meant to state that Yolanda did not deserve "to live, like me."

As he testified at trial, defendant also argues that the statement, "I know what I *did* to Yolanda is wrong" referred to the earlier December 30, 1996 incident, not to an intent to hurt Yolanda in the future. Although defendant actually wrote the note several days earlier, the note was dated April 27, 1997, the day defendant burned Yolanda. Thus, the jury could have reasonably concluded that defendant intended the note to be discovered *after* he burned Yolanda, and

46

after he and Yolanda were dead, and that was why defendant asked his parents to care for Little Howie.

Moreover, the jury could have reasonably concluded that defendant planned the precise manner of killing. Defendant stated that he arrived on time at 4:00 p.m. to meet Yolanda and the children and became angry and frustrated because they were late. However, the jury could have reasonably rejected his testimony that they were late, since the 911 call reporting Yolanda on fire was received at 3:21 p.m. Yolanda's son, Patrick, stated that defendant appeared nervous as they drove up to the Chuck E. Cheese restaurant. The police found that the gas cap from defendant's car was on the car's bumper and that the car's steering wheel was locked by a Club device. Thus, the jury could have reasonably concluded that defendant came early, before Yolanda's arrival, and siphoned gasoline out of his gas tank to fill the plastic container he intended to use to pour gasoline on Yolanda. Further, it could have reasonably rejected defendant's testimony that he only intended to take his son on a drive. Instead, it could have reasonably concluded that defendant placed Little Howie in his car for his safety, so that he could then beat and incapacitate Yolanda to enable him to pour gasoline on her and her car, and set her on fire.

Finally, the manner of killing itself demonstrates premeditation and deliberation. The evidence revealed that defendant was still angry at Yolanda for leaving him and taking his son. Edward Jasso testified that, while beating Yolanda, defendant looked angry and called her a "fucking bitch." Moreover, the evidence showed that defendant's acts occurred in stages. Defendant beat and kicked Yolanda repeatedly, then stopped to retrieve the plastic container from his car. He returned to Yolanda and poured gasoline on her. He dragged Yolanda to his car, but then released her to retrieve a cigarette lighter from his car. He then chased her and set her on fire. Thus, the jury could have reasonably concluded

47

that defendant had many opportunities to consider and reflect on his actions, but chose to continue with his plan to set Yolanda on fire and kill her. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 767 [premeditation and deliberation does not require extended period of time; " '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly' "].) As the prosecutor argued, no one intentionally throws gasoline on a person and sets them on fire if he or she does not intend to kill that person.

The evidence shows that defendant had a motive and committed the killing in the manner he had planned. We find ample evidence of premeditation and deliberation.

### 2) *Torture Murder; Torture Special-circumstance Finding*

Defendant contends that the prosecution presented insufficient evidence to support the first degree murder conviction based on a torture-murder theory and the torture special-circumstance finding.

First degree murder includes a murder perpetuated by means of torture. (§ 189.) " 'The elements of torture murder are: (1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' [Citation.]" (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) Murder by torture does not require that a defendant have an intent to kill or that the victim be aware of the pain. (*People v. Cook* (2004) 39 Cal.4th 566, 602.) The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. (*People v. Chatman*, *supra*, 38 Cal.4th at p. 390.) We also have " 'cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat

48

of passion, in an "explosion of violence," as with the intent to inflict cruel suffering.' " (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1213-1214.)

Defendant argues that the *only* reasonable interpretation of the evidence is that the acts of pouring gasoline on Yolanda and setting her on fire was simply an unplanned, impulsive explosion of violence resulting from a fight that spun out of control. Again, defendant relies primarily on his own testimony at trial, while ignoring the prosecution's evidence and the reasonable inferences to be drawn therefrom. Given defendant's prior physical abuse of Yolanda, his attempts to control her by preventing communication with her family, his anger with Yolanda for leaving him and taking his child, and concealing her whereabouts, and the repeated threats against Yolanda's family, the jury could have reasonably concluded that when defendant intentionally set Yolanda on fire as he had planned, he intended to cause Yolanda extreme pain and suffering as punishment or for revenge. (See e.g., *People v. Cole*, *supra*, 33 Cal.4th at p. 1214 [torture-murder conviction supported by evidence of prior tumultuous domestic relationship, victim's plan to leave defendant, threats against victim, and manner of killing victim by burning her with flammable liquid].) As the prosecutor argued, someone who sets a person on fire with gasoline clearly intends to inflict extreme and prolonged pain on that person. Moreover, after defendant set Yolanda on fire, he fled from the scene and failed to aid in rescue attempts. (See *People v. Martinez* (1952) 38 Cal.2d 556, 561 [defendant burned wife with gasoline and failed to aid in and hindered rescue attempts].) Such evidence, together with the resulting condition of Yolanda's body and her painful, prolonged death 10 days later "permitted an inference that defendant set [the victim] on fire with the intent to inflict extreme pain for the purpose of revenge." (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 294; see also *People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 201 [victim's wounds inflicted by defendant's attack and

49

incapacitation of victim, and methodical burn wounds inflicted with hot cooking oil on victim's body supported jury's finding defendant had willful, deliberate, and premeditated intent to cause extreme pain or suffering for sadistic purpose].) The nature of Yolanda's wounds and the circumstances surrounding the killing provide sufficient support for a first degree murder conviction premised on a torture-murder theory. The jury could reasonably reject defendant's testimony to the contrary.

We further conclude sufficient evidence supported the jury's true finding on the torture-murder special-circumstance allegation. The special circumstance requires that a murder be "intentional" and "involv[e] the infliction of torture," which includes a torturous intent. (§ 190.2, subd. (a)(18); *People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 202; *People v. Elliot*, *supra*, 37 Cal.4th at pp. 469, 479.) As reflected above, the evidence supports the jury's conclusion that defendant intended to kill Yolanda, and that the murder involved the infliction of torture.

### 3) Murder by Lying In Wait; Lying-in-wait Special-circumstance Finding

Defendant contends that the evidence was insufficient to support the lying-in-wait special-circumstance finding because the murder was not committed "while" lying in wait and his true concealed purpose was to take Yolanda's son and not to murder her. He is wrong.

At the time of defendant's crime, the special circumstance required that the murder be committed "while lying in wait."[7] (§ 190.2, former subd. (a)(15); *People v. Lewis*, *supra*, 43 Cal.4th at pp. 511-512.) Also, at that time, "the

---

[7] In March 2000, the language of the lying-in-wait special circumstance was changed to delete the word "while" and substitute the phrase "by means of." (Stats. 1998, ch. 629, § 2, p. 4165; see *People v. Lewis* (2008) 43 Cal.4th 415, 512, fn. 25.)

requirements of the lying-in-wait special circumstance were slightly different from, and more stringent than, the requirements for lying-in-wait first degree murder. [Citation.] Whereas lying-in-wait first degree murder required only that the murder be perpetrated 'by means of' lying in wait (§ 189), the lying-in-wait special circumstance applied to murder committed '*while* lying in wait' (§ 190.2, former subd. (a)(15), italics added)." (*People v. Lewis*, *supra*, 43 Cal.4th at pp. 511-512.) Further, the lying-in-wait special circumstance requires intent to kill, while lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death. (*People v. Moon* (2005) 37 Cal.4th 1, 24, fn. 1.) As shown below, because the evidence supports the special circumstance, it necessarily supports the theory of lying-in-wait first degree murder.

" ' "The lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' [Citations.] 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' [Citation.]" [Citation.]' [Citation.]" (*People v. Combs*, *supra*, 34 Cal.4th at p. 853.)

First, the evidence established that defendant concealed his intent to kill Yolanda. From the note to his parents, the jury could have reasonably concluded that defendant intended to kill Yolanda. He concealed his purpose by luring Yolanda to the restaurant under the pretext of an attempted reconciliation and a familial visit. Patrick testified that defendant had been calling Yolanda, claiming he wanted to reconcile with her. Defendant testified that he had convinced Yolanda to bring the children to meet him once before, and that the meeting had

51

occurred without incident.  Defendant further testified that he told Yolanda he wanted to get back together with her, and when she refused he told her he might do something to himself.  She then agreed to meet him at the Chuck E. Cheese restaurant.  (See *People v. Sims* (1993) 5 Cal.4th 405, 433 [defendant lured victim to motel room on pretext of ordering pizza, concealing true intent to rob and murder him].)  Moreover, from the removed gas cap from defendant's car, the jury could have reasonably concluded that defendant prepared the instruments of her killing before Yolanda's arrival at the restaurant.

Defendant claims that there is no evidence his concealed purpose was a murderous one.  Instead, he argues the evidence shows that his pretextual request to see Yolanda concealed his true purpose of taking his son from her.  Again, defendant focuses solely on his own testimony.  In contrast, the prosecution's evidence revealed that before Yolanda arrived, defendant locked his steering wheel, which was not conducive to a quick getaway with his son.  Moreover, defendant had the opportunity to leave after he secured Little Howie in his car, but did not.  Indeed, as the Attorney General points out, the defense did not even argue to the jury that defendant's true concealed purpose was to take his son from Yolanda.  The evidence supports the jury's finding that defendant concealed his intent to kill Yolanda.

Second, the evidence showed that defendant engaged in a substantial period of watching and waiting for an opportune time to act.  "Watchful" does not require actual watching; it can include being "alert and vigilant" in anticipation of the victim's arrival to take him or her by surprise.  (*People v. Sims*, *supra*, 5 Cal.4th at p. 433.)  The jury could have reasonably concluded that defendant was at the restaurant long enough to secure his car with the Club locking device and remove gasoline from his gas tank to fill up the plastic container in his trunk.  Defendant testified that he waited for Yolanda for 30 to 40 minutes.  Although defendant

52

testified that he and Yolanda planned to meet at 4:00 p.m., the 911 call reporting Yolanda on fire was received at 3:21 p.m. The jury could have reasonably concluded that if Yolanda was early for the meeting, defendant arrived even earlier and waited to take her by surprise. According to Patrick, defendant was clapping his hands and appeared nervous when they arrived at the restaurant. Thus, the evidence reflects that defendant was waiting nervously for Yolanda's arrival to set his deadly plan in motion.

Finally, the evidence reflects that immediately after the period of watching and waiting, defendant launched a surprise attack on the unsuspecting victim from a position of advantage. Immediately after Yolanda's arrival, defendant grabbed Little Howie and placed him in his car. From this evidence, the jury could have reasonably inferred that defendant placed his son there for safety purposes, to protect him from the fire defendant intended to start. When Yolanda attempted to retrieve her son, she and defendant began to argue and push each other. Defendant beat and kicked Yolanda and returned to his car to retrieve the gasoline, which he then poured on Yolanda's car and on Yolanda. He then beat her again and grabbed her by the hair and attempted to drag her back to his car to get something with which to ignite the gasoline. Finally, defendant let Yolanda go and went to his car for the lighter. Yolanda tried to get away, but defendant caught her and set her on fire.

Defendant argues that there was insufficient evidence the killing took place "while lying in wait" (§ 190.2, former subd. (a)(15)), i.e., " 'during the period of concealment and watchful waiting.' " (*People v. Lewis*, *supra*, 43 Cal.4th at p. 512.) "Although we have not defined the parameters of a murder committed 'during the period of concealment and watchful waiting,' the language of [CALJIC No. 8.81.15 (1989 rev.)] supplies meaning to that phrase. That instruction stated: 'Thus, for a killing to be perpetrated while lying in wait, both

53

the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends.  [¶]  If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the special circumstance is not proved.' "  (*People v. Lewis*, *supra*, 43 Cal.4th at p. 512.)  Here, the trial court instructed the jury in the language of CALJIC No. 8.81.15.

Yolanda met with defendant under the belief he wanted a reconciliation and to visit with Little Howie.  Instead, defendant launched a surprise attack with the intent to set her on fire.  It began with the preparatory step of taking Little Howie away from his mother, and was followed immediately with the beating of Yolanda when she attempted to retrieve her son and the lethal acts of dousing Yolanda with gasoline and igniting it.  Although there were discrete events during which defendant beat Yolanda, went to his car to retrieve gasoline and the lighter, and poured gasoline on Yolanda and lit it, the time between each event took only minutes or seconds.  Thus, contrary to defendant's claim, "no 'cognizable interruption' occurred between the period of watchful waiting and the commencement of the murderous *and continuous* assault which ultimately caused her death."  (*People v. Morales* (1989) 48 Cal.3d 527, 558; *People v. Carpenter* (1997) 15 Cal.4th 312, 389 [end of lying in wait, attempted rape, and killing occurred within minutes]); compare with *People v. Lewis*, *supra*, 43 Cal.4th at pp. 511, 514-515 [cognizable interruption occurred between period of watchful waiting and killings, when defendant and accomplices kidnapped victims and proceeded to drive them to ATM machines from which he withdrew their funds before killing them]; *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000, 1011-1012 [cognizable interruption when defendant killed victim hours after

54

kidnapping that was preceded by period of lying in wait].) Moreover, the jury could reasonably find no lapse in defendant's culpable mental state between the homicide and the period of watchful waiting. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 514, quoting *People v. Carpenter*, *supra*, 15 Cal.4th at p. 389 [no cognizable interruption where no lapse in defendant's culpable mental state].)

Defendant argues that Yolanda was not surprised as evidenced by her attempt to flee when defendant retrieved the plastic container. However, the attack on her had already begun. Initially, on seeing defendant as planned and on having had a prior, peaceful meeting with defendant, Yolanda would not immediately have suspected she was in danger and could not have anticipated defendant's deadly intentions. (See e.g., *People v. Moon*, *supra*, 37 Cal.4th at pp. 22, 24 [being well acquainted with defendant, victim would not immediately suspect danger].) Also, because it appeared that the prior domestic assaults on Yolanda occurred within the privacy of their home, the jury could reasonably infer that she could not have anticipated that defendant would beat her in public and certainly not set her on fire there. (See e.g., *People v. Stevens* (2007) 41 Cal.4th 182, 203 [defendant lured victim into vulnerable position by creating or exploiting false sense of security].)

Because we find that substantial evidence supports the lying-in-wait special circumstance, we also conclude there was substantial evidence to support the lying-in-wait theory of first degree murder.

Defendant contends that if we conclude the evidence is sufficient to support the lying-in-wait special-circumstance finding here, then the special circumstance is unconstitutional as applied to this case. In essence, defendant argues that the lying-in-wait special circumstance is too broad if the facts of this case fall within it. "That is simply another way to state his facial attack on the statute, which we have rejected [below]. [Citation.]" (*People v. Lewis*, *supra*, 43 Cal.4th at p. 517.)

55

*4. Unconstitutionality of the Torture Special-circumstance and Murder by Torture Instructions*

The trial court instructed the jury with CALJIC No. 8.81.18, directing that a true finding as to the torture special circumstance required proof that defendant intended to kill a human being; that defendant "intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose;" and that defendant "did, in fact, inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration."

Defendant contends that the language "extreme cruel physical pain" and "any sadistic purpose" renders the instruction unconstitutionally vague and overbroad. He further claims that the trial court's giving of CALJIC No. 8.24, which used similar language ("extreme and prolonged pain . . . for . . . any sadistic purpose") regarding first degree murder by torture, is also too vague. We have previously rejected such claims and do so again here. (*People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 223; *People v. Cook*, *supra*, 39 Cal.4th at p. 602; *People v. Chatman*, *supra*, 38 Cal.4th at pp. 394-395; *People v. Raley* (1992) 2 Cal.4th 879, 898-902.)

Defendant further claims that the giving of CALJIC No. 8.81.18 confused the jury by stating that defendant must have inflicted pain, but the victim's awareness of pain was not required. We have rejected this contention before and continue to do so. (*People v. Chatman*, *supra*, 38 Cal.4th at p. 394; *People v. Cole*, *supra*, 33 Cal.4th at p. 1228.) Moreover, although the instruction included the requirement involving the infliction of extreme cruel physical pain on a living victim, that requirement was eliminated by the enactment of Proposition 115 in 1990. (*People v. Elliot*, *supra*, 37 Cal.4th at pp. 453, 476-477.) Because the 1990 amendment governs this case, the required finding of an additional but

unnecessary "element" could redound only to defendant's benefit. (See *People v. Cole*, *supra*, 33 Cal.4th at p. 1228.)

Finally, contrary to defendant's claim, the special circumstance of intentional murder involving the infliction of torture does not violate the Eighth Amendment by failing to narrow the class of persons eligible for the death penalty. (*People v. Jennings* (2010) 50 Cal.4th 616, 649; *People v. Bemore* (2000) 22 Cal.4th 809, 843; *People Barnett* (1998) 17 Cal.4th 1044, 1162-1163; see *People v. Davenport* (1985) 41 Cal.3d 247, 271 [torture special circumstance distinguished from murder by torture by requiring intent to kill].)

### 5. *Unconstitutionality of Lying-in-wait Special Circumstance and Instructions*

Defendant claims that CALJIC No. 8.81.15, the lying-in-wait special-circumstance instruction given in this case, omitted key elements. First, he contends that the standard instruction failed to explain to the jury that the concealed purpose must be an intent to kill and that the watchful waiting had to be for a time to launch a lethal attack. He argues that because the evidence supported a finding that his true concealed intent was to take his son, the instructions would have permitted the jury to find that the concealment and watchful waiting elements were satisfied based only on such a nonlethal intent. He is wrong.

CALJIC No. 8.81.15 instructed that "for a killing to be perpetuated while lying in wait": (1) the killing must be *intentional* and (2) "both the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends." In addition, the instruction required an immediate killing or a continuous flow of the uninterrupted lethal events from the period of lying in wait. (*Ibid.*) Finally, the instruction stated that, "[W]hen a defendant *intentionally* murders another person, under circumstances which include (1) a concealment of

purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, the special circumstance of murder while lying in wait has been established." (*Ibid*.) Because the instruction required an *intentional* killing and an uninterrupted connection between the *lethal acts* and the period of lying in wait, a reasonable jury would not have believed that the nonlethal act and intent of taking Little Howie would have satisfied the requirements of concealment of purpose and watchful waiting to act.

Second, defendant contends that the special instructions given by the court at the prosecutor's request, together with CALJIC No. 8.81.15, failed to instruct on an intent to kill and eliminated the immediacy of attack requirement. Again, he is wrong.

The prosecutor requested three special instructions on lying in wait. Although defendant objected to special instructions 1 and 3, the trial court gave all three special instructions. Special instruction 1 emphasized that the special circumstance of lying in wait — unlike lying-in-wait murder — required that the killing be committed "while" lying in wait. Elaborating on the distinction, special instruction 3 explained: "Use of the word 'while' in the special circumstance of lying in wait means that the killing must take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the special circumstance does not exist. A brief interval of time between the killer's first appearance and the acts inflicted which cause the killing do not necessarily negate a surprise attack, so long as there is a continuous flow in the culpable state of mind between the period of watchful waiting and the homicide."

58

Focusing on the last sentence of special instruction 3, defendant claims that because "it is not clear to what culpable state of mind the instruction refers," the jury "could equate culpable mental state with one that is non-lethal or merely deceitful," i.e., that defendant's intent was to take his son from Yolanda by a ruse. However, when considered with CALJIC No. 8.81.15, it is clear that the necessary "culpable state of mind" was the intent to kill. Moreover, during closing argument, the prosecutor emphasized the requirement of intent to kill. Thus, there is no reasonable likelihood the jury misapplied the instruction in the manner defendant claims. (*People v. Huggins* (2006) 38 Cal.4th 175, 192.)

Defendant further claims that the last sentence of special instruction 3 told the jury that " 'the continuous flow' only need be 'the culpable state of mind' *regardless of the actual events that had occurred*" and that a continuous flow of the lethal events was not required. Again, defendant focuses on an isolated sentence rather than the full context. The first sentence of special instruction 3 told the jury that "the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends." CALJIC No. 8.81.15 also told the jury that "If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted *lethal events*, the special circumstance is not proved." (Italics added.) The instruction further stated that the surprise attack must occur immediately after the period of watching and waiting. Considered as a whole, the instructions clearly conveyed the immediacy requirement regarding the lethal acts.

Finally, defendant contends that the lying-in-wait special circumstance is unconstitutional because there is no meaningful distinction between the special circumstance, and premeditated, deliberate murder and murder by means of lying in wait. He also argues the special circumstance does not meaningfully

59

distinguish death eligible defendants from those not death eligible. We have rejected these contentions before and continue to do so. (*People v. Stevens*, *supra*, 41 Cal.4th at pp. 203-204; *People v. Nakahara* (2003) 30 Cal.4th 705, 721; *People v. Gutierrez* (2009) 28 Cal.4th 1083, 1148-1149.)

### 6. *Unconstitutionality of Jury Instructions Assertedly Affecting Reasonable Doubt Standard*

Without objection, the trial court gave the standard instructions on (1) circumstantial evidence (CALJIC Nos. 2.01 [sufficiency of circumstantial evidence-generally], 2.02 [sufficiency of circumstantial evidence to prove specific intent], 8.83 [sufficiency of circumstantial evidence to prove the special circumstance], and 8.83.1 [sufficiency of circumstantial evidence to prove mental state]); (2) the definition of reasonable doubt (CALJIC Nos. 2.90); (3) motive (CALJIC Nos. 2.51); and (4) other general principles (CALJIC Nos. 1.00 [respective duties of judge and jury], 2.21.1 [discrepancies in testimony], 2.21.2 [witness willfully false], 2.22 [weighing conflicting testimony], 2.27 [sufficiency of testimony of one witness], 8.20 [deliberate and premeditated murder]). Defendant claims that those instructions, singly and collectively, impermissibly diluted the reasonable doubt standard.

We have repeatedly rejected the same challenges to all of these instructions. (*People v. Parson* (2008) 44 Cal.4th 332, 358; *People v. Whisenhunt*, *supra*, 44 Cal.4th at pp. 220-221; *People v. Howard* (2008) 42 Cal.4th 1000, 1025-1026 & fn. 14; *People v. Kelly* (2007) 42 Cal.4th 763, 792.) Each of these instructions " 'is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof.' " (*People v. Kelly*, *supra*, 42 Cal.4th at p. 792.)

60

### 7. *Flight instruction*

The trial court instructed the jury, pursuant to CALJIC No. 2.52, that a person's flight immediately after a crime, or after he or she is accused of a crime, cannot alone establish guilt, but may be considered together with other proven facts in deciding the defendant's guilt or innocence. Defendant does not contend that the instruction was not supported by the evidence. Rather, he claims that the giving of this instruction violated his constitutional rights because it unnecessarily duplicated the circumstantial evidence instructions, was impermissibly argumentative, and improperly permitted the jury to draw irrational inferences concerning defendant's mental state before or during the killing.

Contrary to defendant's claim, CALJIC No. 2.52 is not a duplicate instruction. CALJIC Nos. 2.00, 2.01, and 2.02 instructed on the definition of circumstantial evidence and its sufficiency in establishing facts to establish guilt. On the other hand, CALJIC No. 2.52 was a cautionary instruction that benefitted the defense by "admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

Regarding the remaining claims, we repeatedly have rejected these challenges to the instruction. (*People v. Loker* (2008) 44 Cal.4th 691, 706-707; *People v. Howard*, *supra*, 42 Cal.4th at p. 1021; *People v. Morgan* (2007) 42 Cal.4th 593, 621; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1160; *People v. Thornton* (2007) 41 Cal.4th 391, 438; *People v. Jurado* (2006) 38 Cal.4th 72, 125-126.)

### 8. *Failure to instruct that jurors must agree unanimously on theory of first degree murder*

The trial court instructed the jury on first degree premeditated murder, first degree murder by torture, and first degree murder perpetuated by means of lying in

wait.  The court did not instruct the jury that it must agree unanimously on a theory of first degree murder to find him guilty of that charge.  Defendant argues that this instructional omission was prejudicial error.  We rejected the identical claim in *People v. Cole*, *supra*, 33 Cal.4th 1158, where the jury was instructed on the same theories of first degree murder as in this case.  (*Id.* at p. 1221; see also *People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 222.)  In any event, the jury unanimously found true the torture-murder and lying-in-wait special-circumstance allegations.  Therefore, the jury unanimously agreed that defendant committed the crime of first degree murder on both theories of torture murder and lying-in-wait murder.  (*People v. Moon*, *supra*, 37 Cal.4th at p. 22; *People v. Cole*, *supra*, 33 Cal.4th at pp. 1226-1227; see *People v. Hawthorne*, *supra*, 46 Cal.4th at pp. 89-90.)

### D.  Penalty Phase Issues

#### 1.  Failure to give CALJIC No. 8.88

Defendant claims that the trial court's failure to instruct the jury on the process of weighing the aggravating and mitigating factors to determine the appropriate penalty, in the language of CALJIC No. 8.88, requires reversal of the penalty judgment.  We conclude that based on the whole record including the instructions given, arguments of counsel, and the court's response to the jury's note during deliberations, the failure to instruct on the procedure used in determining penalty, though error, was harmless in this case.

After defining the meaning of aggravating and mitigating factors,[8] CALJIC No. 8.88 instructs the jury on the procedure used in weighing the aggravating and

---

[8]     Because the words "aggravating" and "mitigating" are commonly understood terms, a definitional instruction is not required.  (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1066.)

62

mitigating circumstances in determining the appropriate penalty.  It states, in relevant part:

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them.  You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.  In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.  To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

It appears that the trial court intended to give CALJIC No. 8.88, but inadvertently omitted part of the instruction, including the above paragraph.  The record indicates that the trial court meant to divide the instruction into two parts and to give each part separately.  It gave a modified version of the second part of CALJIC No. 8.88 as the concluding instruction, but inexplicably failed to give the first part of the instruction.[9]

CALJIC No. 8.88 was drafted in response to *People v. Brown* (1985) 40 Cal.3d 512 (*Brown*).  Former CALJIC No. 8.84.2 (the predecessor to CALJIC No.

---

[9]     The trial court instructed: "You shall now retire and select one of your number to act as foreperson.  He or she will preside over your deliberations.  In order to make a determination as to the penalty, all twelve jurors must agree.  As soon as you have agreed upon a verdict so that, when polled, each may state truthfully that the verdict expresses his or her vote, have it dated and signed by your foreperson and then return it to this courtroom.  Return any unsigned verdict forms."

8.88) instructed, in the unadorned language of section 190.3, that the jury "shall" impose a sentence of death if it concludes that the aggravating circumstances outweigh the mitigating circumstances. Conversely, it instructed that the jury "shall" impose a sentence of confinement in state prison for life without possibility of parole if it concludes that the aggravating circumstances do not outweigh the mitigating circumstances. (*People v. Myers* (1987) 43 Cal.3d 250, 273; *People v. Allen* (1986) 42 Cal.3d 1222, 1276.) In *Brown*, we held that an instruction using this language could confuse and mislead the jury regarding the manner in which penalty should be determined. (*Brown*, *supra*, 40 Cal.3d at p. 544, fn. 17.) "One danger is that the jury will perform the weighing process in a mechanical fashion by comparing the number of factors in aggravation with the number in mitigation, or by the arbitrary assignment of weights to the factors. [Citation.] The other danger is that the jury will fail to understand that our statutory scheme does not require any juror to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances. [Citations.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1035 (*Edelbacher*).)

Regarding pre-*Brown* cases, in which the trial court instructed in the unadorned language of section 190.3, we stated we would examine each prior case "on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Brown*, *supra*, 40 Cal.3d at p. 544, fn. 17.)

Consequently, in such pre-*Brown* cases, we reviewed the whole record, including the arguments of counsel, to determine whether instructing in the unadorned statutory language and omitting clarifying language, may have mislead the jury to defendant's prejudice concerning the proper scope of its sentencing discretion. (See e.g., *Edelbacher*, *supra*, 47 Cal.3d at p. 1037; *People v. Myers*,

*supra*, 43 Cal.3d at p. 275 (*Myers*); *People v. Allen*, *supra*, 42 Cal.3d at pp. 1277-1280 (*Allen*).)

In *Allen*, we held that it was not likely the jury was misled about the scope of its sentencing discretion. In making that determination, we emphasized that the prosecutor, during argument, did nothing to mislead the jury about the weighing process and its weighing discretion, but that "he in fact left it with the understanding that the value to be assigned to the aggravating and mitigating factors was a matter to be decided by each individual juror." (*Allen*, *supra*, 42 Cal.3d at p. 1278.) Also, we noted that during argument, the prosecutor never misled the jury about its sole responsibility of determining the appropriate penalty based on its individualized weighing discretion, but instead focused on the appropriateness of the death penalty under all the circumstances of the case. (*Id.* at pp. 1278-1280.)

In *Myers*, we held that it was unlikely the jury was misled regarding the first source of potential confusion — the nature of the weighing process — identified in *Brown*. We relied on the fact that the prosecutor and defense counsel correctly argued that the jury was free to " 'attach whatever weight is appropriate' to each of the relevant factors." (*Myers*, *supra*, 43 Cal.3d at p. 275.) Regarding the second source of potential confusion — the discretionary nature of the penalty determination — identified in *Brown*, we concluded that there "seem[ed] no question but that the jury may well have been misled to defendant's prejudice." (*Ibid.*) We noted that the prosecutor incorrectly argued that the penalty determination was simply a weighing process, that the determination of penalty was mandatory based on whether the aggravating or mitigating circumstances preponderated, and that when the weighing process was completed, the jury could not return a penalty verdict based on its personal preference. (*Ibid.*) In reversing the death judgment, we further noted that "the prosecutor's characterization of the

jury's function . . . was not refuted or corrected by the court's instructions." (*Id.* at p. 276.)

As in *Allen* and *Myers*, the trial court in *Edelbacher* instructed in the unadorned language of section 190.3. In determining whether there was substantial danger that the jury was misled with respect to the two sources of potential confusion identified in *Brown*, we looked to the instructions given, the arguments of counsel, *and* the trial court's *failure* to instruct on crucial aspects of the penalty process. (*Edelbacher*, *supra*, 47 Cal.3d at pp. 1036-1041.)

Regarding the nature of the weighing process, we noted that the court gave a supplemental explanatory instruction that told the jury it was not to determine the ultimate punishment by simply counting the number of aggravating and mitigating circumstances on each side, but to determine their weight by their relative convincing force. On the other hand, the court refused to instruct that the weight to be given any factor was to be decided by each juror individually. We concluded that "on the whole," the arguments of counsel were "not seriously misleading" because the prosecutor and defense counsel correctly stated in argument that the weighing process was qualitative and that the sheer number of factors in aggravation or mitigation was not determinative. (*Edelbacher*, *supra*, 47 Cal.3d at p.1036.)

Regarding the discretionary nature of the penalty determination within the context of the weighing process, we noted that the trial court did not inform the jury that its responsibility, based on its individualized weighing discretion, was to determine the appropriate penalty or that the weight to be given any factor was to be decided by each juror individually. (*Edelbacher*, *supra*, 47 Cal.3d at pp. 1036-1037.) We stated that, "The failure to give any sufficient clarifying instruction on this crucial aspect of the penalty determination process requires us to examine the whole record, including the arguments of counsel, to determine whether the jury

66

may have been misled to defendant's prejudice concerning the proper scope of its sentencing discretion." (*Edelbacher*, *supra*, 47 Cal.3d at p. 1037.)

We noted that during argument, the prosecutor repeatedly emphasized that the determination was simply a weighing process and that a death sentence was mandatory if aggravating circumstances preponderated, without reference to the jury's view of the appropriateness of the penalty. Although defense counsel stressed the individualized and moral or normative nature of the penalty decision (*Edelbacher*, *supra*, 47 Cal.3d at pp. 1037-1040), we reasoned that "[t]he prosecutor and defense counsel, through their arguments, constructed starkly different models of the sentencing process" and there was "no way of knowing which model the jurors adopted in reaching their penalty verdict." (*Id*. at p. 1040.) Thus, there was a substantial danger the jury was misled with respect to the proper context of the weighing process and the discretionary nature of the penalty determination. (*Id*. at p. 1036.)

In *People v. Brasure*, *supra*, 42 Cal.4th 1037 (a post-*Brown* case), the trial court substituted its own instruction for CALJIC No. 8.88. It told the jury it " 'shall impose a sentence of death if the jury concludes that the aggravating circumstances outweigh the mitigating circumstances' " and "omitted the language of CALJIC No. 8.88 providing that to return a death verdict each juror 'must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.' " (*People v. Brasure*, *supra*, 42 Cal.4th at pp. 1060-1061.)

After considering the totality of the instructions and arguments, we concluded that there was no reasonable likelihood the trial court's failure to instruct as directed in *Brown* misled the jurors as to the scope of their sentencing discretion or responsibility. (*People v. Brasure*, *supra*, 42 Cal.4th at pp. 1062, 1064-1065.)

67

Unlike the above cases, the trial court here did not give a confusing or misleading instruction, but failed to instruct the jury at all on the procedure used in determining penalty. (See *Henderson v. Kibbe* (1977) 431 U.S. 145, 155 ["[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law"].) However, after considering the instructions given, the arguments of counsel, and the court's response to the jury's note during deliberations, we conclude that the court's failure to instruct in the pertinent language of CALJIC No. 8.88 did not mislead the jury or leave it without adequate guidance as to the scope of their sentencing discretion or responsibility. (*People v. Brasure*, *supra*, 42 Cal.4th at pp. 1062, 1064-1065; cf. *People v. Moon*, *supra*, 37 Cal.4th at p. 39 [omission of evidentiary instructions at penalty phase, though error, was harmless; defendant failed to demonstrate that instructions given, to a reasonable likelihood, precluded jury from considering any constitutionally relevant mitigating evidence].)

Before the court instructed the jury, the parties gave their closing arguments. Neither party objected to the opposing party's comments on the procedure used in determining the appropriate penalty. During argument, the prosecutor never suggested that the weighing process was a mechanical, quantitative process, but instead told the jury it involved a qualitative process, allowing each juror the choice to assign any moral or sympathetic value to each of the factors. In this regard, the prosecutor argued:

"In this phase, you must consider any sympathetic aspect of the defendant's character or anything else that he has coming to him for mitigation. You must consider that and weigh it. That's only fair. So go ahead and do that."

The prosecutor further stated:

"If [defendant] deserves any sympathy, again, then give it to him. If he is sincere about finding God, then good for him. But what he has done is simply not

68

sufficient to override — I'm sorry — what he feels about sympathy is simply not sufficient to override all this horrible stuff he's done here. The aggravating factors clearly and substantially outweigh any of that.

"And none of you, in your jury questionnaires, said 'Well, you know, I don't care what a guy's done or how bad it is, as long as he says he's sorry. If he says he's sorry, then I'll give him a pass. I'll let him have LWOP.' None of you said that. And you shouldn't, of course. I mean, you take it into account, but you're supposed to weigh it. If the aggravating circumstances outweighs mitigating, that's what you do.

"His soul may belong to God, but under our law, his life belongs to the State because of our system of justice, which requires that you weigh and consider both. And if the aggravating substantially outweighs the mitigating, death penalty. That's the way our law is. And that's what you must follow."

Defense counsel reinforced that the weighing function was a qualitative assessment, explaining: "Now you are free to assign your own sympathetic or moral value to each one of these factors. The law doesn't — doesn't require you to set certain values. You do this on your own values."

Moreover, unlike *Myers* and *Edelbacher*, the prosecutor never suggested that a death sentence was mandatory if aggravating circumstances simply preponderated, but instead conveyed that the penalty determination was discretionary and rested on the jury's view of the appropriateness of the penalty. He stated:

"In this case we're asking a very serious decision be made here. And I'm fully aware of how serious it is and what I'm asking you to do. I'm asking you to give [defendant] the death penalty. And the way I'm asking you to arrive at that decision, which I believe to be the just decision, is to engage in a weighing process.

69

"The judge is going to instruct you that what you need to do is to weigh all these various aggravating and mitigating factors that we kind of touched upon in the first part of the trial. And the notion is that you must weigh all of this together. And if the aggravating factors, particularly A, B, and C, which I'll get to in a second, if they substantially outweigh the mitigating factors and *you believe that's the proper verdict*, then you should vote for the death penalty. And that's what we're asking you to do here."[10] (Italics added.)

As with the prosecutor, defense counsel reiterated the applicable standard as set forth in CALIC No. 8.88. He told the jury that "to return a judgment of death, each of you must be persuaded that the aggravating circumstances . . . are so substantial in comparison to the mitigating circumstances it warrants death instead of life without possibility of parole. So the factors in aggravation have to be so substantial in your mind in comparison to the mitigating factors that you are going to kill this man."

---

**10** Defendant claims that the prosecutor improperly argued that if the aggravating circumstances outweighed the mitigating circumstances, death was mandatory. He points to the following passage in which the prosecutor argued: "The law says we give the death penalty where the aggravating factors substantially outweigh the mitigating factors in a given case. That means there's a line, a line you just don't cross. And if you cross that line, if you go over that line, you go too far, then you've done a crime that *requires* the death penalty. [¶] And you need to ask yourselves and ask your hearts, is this the kind of crime that is so heinous, so wicked, so mean spirited that it requires the death penalty? Even if you find some sympathy for [defendant] for one reason or another, your job is to act as the conscience of the community and to *exercise your own conscience* and say, 'I'm sorry, [defendant]. I might feel sorry for you for this reason or that, but you crossed the line, you went too far. You committed this most heinous of murders."

When taken in context, the prosecutor was simply arguing that once the floor has been established, where the aggravating factors substantially outweigh the mitigating ones, the death penalty was the appropriate penalty in light of the circumstances of the crime.

Also, defense counsel clarified even further the individualized and moral or normative nature of both the weighing process and the ultimate, penalty determination. He emphasized that the jury could apply sympathy or moral values to specifically designated factors, stating "[y]ou could apply some value to it, sympathy or moral value of *your own. You own feelings, not somebody else's*." (Italics added.) Counsel further emphasized that the final decision regarding penalty was an individual one: "[y]ou have to decide whether or not he lives or dies. That has to come from you. You have to apply your sympathetic and moral values that you have on your own."

Defense counsel concluded his argument with the final remarks:

"When you go back there and decide and think of this and look at this, remember that the letter of the law allows you as an individual, as a person, to decide whether or not you are going to accept a factor or you are going to apply some less value to one factor than you will the other factor. That is you, as individuals, must do that in your own conscience, your own way.

"We need each and every one of your decisions, your judgment. We need for you to go in there and talk and discuss it with each other and not get angry with each other, and discuss it with each other, so that you can come to a reasonable verdict. Whatever the law requires. We need for you to listen to the others when the others are against you or for the people that are against one or two persons. Listen. The one or two persons, maybe they might have something to offer. But whatever it is, we need each and every one of you individually to come up with a decision."

The trial court then instructed that the jury was to determine which penalty to impose, death or confinement in the state prison for life without possibility of parole, and that the "law expressly states that it voices no opinion as to which penalty is preferred." It instructed, in the language of CALJIC No. 8.85, that "[i]n

71

determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case." The court further enumerated various factors in aggravation and mitigation and instructed that the jury "shall consider, take into account and be guided by [those] factors, if applicable." (*Ibid*.) One of those factors told the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (*Ibid*.; see § 190.3, factor (k).)

Regarding another factor, other criminal activity involving the use of, attempted use of, or threat to use force or violence (§ 190.3, factor (b)), the trial court instructed in the language of CALJIC No. 8.87, that "[i]t is not necessary for all jurors to agree. If any *individual* juror is convinced beyond a reasonable doubt that the criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose." (Italics added.)

The trial court further instructed that the People and the defendant "have a right to expect that you will . . . exercise your discretion conscientiously, and reach a just verdict," and "are entitled to the individual opinion of each juror," and that "[e]ach of you must decide the case for yourself."

Thus, the instructions informed the jurors that the penalty verdict was an individual, discretionary decision, and that as to at least one factor, each juror was to determine individually whether that factor was an aggravating circumstance.[11]

---

[11]    Defendant contends that the trial court erred in informing the jury there had been a prior penalty phase trial because it was reasonably likely that the jurors

*(footnote continued on next page)*

Most telling were the events that occurred during deliberations. After deliberating for approximately six and a half hours, the jury sent the following note to the trial court:

"Assume the aggravating circumstances in the case, as stated in 8.85, significantly outway [*sic*] the mitigating circumstances, may we still select life without the possibility of parole?

"Is the opinion of the juror(s) that the circumstances presented in this case do not meet the minimum standards for the sentence of death allowed as a mitigating circumstance?"

The trial court responded: "Under the law you are permitted to reach any verdict you wish as to the appropriate penalty."

The note's first question strongly indicates that despite the omission of the portion of CALJIC No. 8.88 at issue, the jury understood its duty to engage in a weighing process. It further indicates that the jury's deliberations were guided by the "so substantial" standard by which it was to weigh the aggravating and mitigating circumstances. Indeed, because the word "significantly" has a qualitative connotation, the jury's use of that word further suggests it was aware of the normative nature of the weighing process.

Defense counsel did not object to the trial court's response, indicating counsel believed it was a correct statement of the law. Although the trial court

_(footnote continued from previous page)_

would believe another jury would decide the penalty after them and thus, lessen their sense of responsibility. During voir dire, the trial court informed the prospective jurors about the prior penalty trial to determine whether they had been exposed to any publicity about that trial. Because the court explained that a decision had not been made at the previous penalty trial, defendant's supposition appears unlikely.

73

should have responded with the giving of CALJIC No. 8.88, nevertheless, it reaffirmed that it was within the jury's discretion to arrive at the appropriate penalty. The court's response correctly informed the jurors that even after they engaged in the weighing process, they had the discretion to vote for life without possibility of parole.

Defendant argues that the note's second question shows that certain jurors did not believe that death was the appropriate penalty, but were unsure whether this merely constituted a mitigating circumstance that should be weighed against aggravating circumstances or whether their belief that death was not the appropriate penalty was sufficient to vote for life even if aggravation outweighed mitigation. However, as the Attorney General argues, defendant reads too much into the question. The note could also be interpreted as asking whether the absence of an aggravating circumstance is a mitigating circumstance. (Cf. *People v. Jackson*, *supra*, 45 Cal.4th at p. 695 [trial court not required to instruct that the absence of a mitigating factor is not aggravating].)

Twenty-two minutes after the trial court sent its response to the jury, the jury sent another note stating, "We cannot all come to a verdict. No unanimous verdict." The trial court informed the jurors that it would not be in session on Friday or the following Monday and directed them to return the following Tuesday after a four-day break. The jury resumed deliberations on Tuesday morning and reached a verdict that afternoon.

As the Attorney General argues, the jury's deadlock indicates that the jury understood they could vote for life without parole even under the circumstances presented in the note, i.e., where the aggravating circumstances substantially outweighed the mitigating circumstances or as defendant argues, where one or more jurors felt the case did not meet the minimum standards for death. The jury's deadlock further shows that at least one juror chose to exercise his or her

74

discretion to vote for life without parole, as permitted by the court's response to the jury's note. It was only after further deliberations that the jury unanimously agreed death was the appropriate verdict. When polled by the court, each juror answered that the death verdict was his or her "personal verdict."

Accordingly, after considering the instructions given, the arguments of counsel, the jury's note and the trial court's response, and the subsequent events suggesting the jury was aware of its proper role in weighing the aggravating and mitigating circumstances, we conclude that there was no reasonable likelihood the trial court's failure to instruct in the relevant language of CALJIC No. 8.88 misled the jurors or left them without adequate guidance as to the scope of their sentencing discretion or responsibility.[12]

### 2. *Admission of Photographs and Tape Recording of Victim in the Ambulance*

Defendant claims that admission of two photographs showing injuries to the victim and the tape recording of the victim's screams during the ambulance ride to the hospital violated Evidence Code section 352 and his federal constitutional rights. The trial court did not abuse its discretion in admitting the evidence.

---

[12] The trial court further erred in instructing, pursuant to CALJIC No. 1.00, that "[b]oth the People and the Defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict *regardless of the consequences*." This instruction applies only to guilt and should not be given in the penalty phase of trial because it has the potential to diminish the jury's responsibility for the penalty decision. (*People v. Ray* (1996) 13 Cal.4th 313, 354; *People v. Jennings* (1988) 46 Cal.3d 963, 991.) For the same reasons omission of CALJIC No. 8.88 was not prejudicial, there was no reasonable likelihood the jurors would have understood that the single, inapplicable phrase reduced their responsibility for choosing the appropriate consequence of life without parole or death. (*People v. Kipp* (1998) 18 Cal.4th 349, 380; *People v. Babbit* (1988) 45 Cal.3d 660, 717-719.)

Before the penalty retrial, defense counsel moved to exclude photographs of the victim's injuries and the ambulance recording as irrelevant. Counsel argued that defendant had already been convicted of committing murder by torture at the guilt phase and that the only purpose for admitting the photographs and ambulance tape would be to inflame the jury. The prosecutor argued that the evidence was relevant to show the circumstances of the crime (§ 190.3, factor (a)) and was particularly important to the jury's understanding of the nature and extent of Yolanda's injuries since this was not the same jury that had heard the guilt phase evidence. The prosecutor further argued that the ambulance tape was relevant as victim impact evidence. Defense counsel responded that the proffered evidence did not show the circumstances of the crime, only occurrences "after the fact." The trial court admitted two of the photographs and the ambulance tape as factor (a) evidence and as victim impact evidence. It expressly determined that the probative value of the evidence outweighed its prejudicial effect.

As stated previously, the photographs and ambulance tape were highly relevant to the issues relating to torture murder and the torture special circumstance. (See *ante*, at pp. 34-40.) Thus, the trial court correctly admitted the evidence to show the circumstances of the crime (§ 190.3, factor (a)). Also, the court properly admitted the evidence as victim impact evidence to show the immediate impact of the crime on the victim and on the children who witnessed their mother or aunt burning and in pain. (See *People v. Hawthorne*, *supra*, 46 Cal.4th at pp. 101-103.)

Given the relevance of the photographs and the ambulance tape, the trial court did not abuse its broad discretion in concluding the evidence was more probative than prejudicial. (*People v. Hawthorne*, *supra*, 46 Cal.4th at p. 103.) Having concluded there was no error and no prejudice, we also reject defendant's federal constitutional claims. (*Ibid*.)

### 3. *Lingering Doubt*

Defendant claims the trial court: (1) improperly instructed that the jury must accept the previous jury's verdicts as having been proved beyond a reasonable doubt and (2) improperly refused his proposed instructions on the elements of the crimes and the concept of lingering doubt. He contends that his federal and state constitutional rights were violated because the court's rulings removed his lingering doubt defense from the jury's consideration. There was no error.

During the instructional conference, the trial court stated it intended to give the prosecution's proposed instruction which stated: "You must accept the previous jury's verdicts as having been proved beyond a reasonable doubt." Defendant asked the court to instruct on the elements of the offenses and special circumstances, and on the concept of lingering doubt. The court refused to give both requested instructions. It reasoned that those elements were not relevant since the issue of defendant's guilt and the truth of the special circumstances had already been determined by the previous jury. The court further reasoned that lingering doubt was a proper subject for argument, but not for instruction and that the proposed instruction was inappropriate because it was addressed to jurors who voted for conviction at the guilt phase.

The trial court properly instructed the jury that the penalty phase jury must conclusively accept the previous guilt phase jury's findings on defendant's guilt and on the truth of the special-circumstance allegations. (*People v. Harrison* (2005) 35 Cal.4th 208, 256; see also *People v. Gay* (2008) 42 Cal.4th 1195, 1223 [defendant may not contest legality of prior guilt phase jury's adjudication of guilt]); *People v. DeSantis* (1992) 2 Cal.4th 1198, 1237-1238 [same].) The court's instruction did not remove the question of lingering doubt from the jury, but only told it the truth: that in the penalty phase defendant's guilt was conclusively

presumed as a matter of law. (*People v. DeSantis*, *supra*, 2 Cal.4th at p. 1238.) Because the penalty jury could not relitigate defendant's guilt and the truth of the special-circumstance allegations, the trial court correctly refused to instruct on the elements of the offenses and special circumstances.

Although it is proper for the penalty jury to consider lingering doubt, there is no constitutional right to instructions on lingering doubt. (*People v. Hamilton* (2009) 45 Cal.4th 863, 948; *People v. Brown* (2003) 31 Cal.4th 518, 567.) " 'Instructions to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance extenuating the gravity of the crime (*id.*, factor (k)), together with defense argument highlighting the question of lingering or residual doubt, suffice to properly put the question before the penalty jury.' " (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 948.)

The court here instructed the jury to consider the circumstances of the crime and any other circumstances extenuating the gravity of the crime. Defendant presented extensive evidence of lingering doubt as to his state of mind at the time he committed the crime, which was the only disputed issue open to lingering doubt. (Compare with *People v. Gay*, *supra*, 42 Cal.4th at pp. 1223-1226 [prejudicial error to exclude lingering doubt evidence contesting defendant's guilt as shooter when coupled with court's instruction to jury to disregard defense counsel's opening statement that it would hear lingering doubt evidence and instruction on conclusiveness of prior guilt jury's findings].) Defense counsel extensively argued lingering doubt during opening and closing arguments, in which he urged the jury to reconsider defendant's guilt and his state of mind. Thus, contrary to defendant's claim, the trial court's rulings did not remove the concept of lingering doubt from the jury's consideration.

*4. CALJIC No. 8.87*

In connection with defendant's threats against the victim's siblings during his search for his family, the trial court instructed the jury with CALJIC No. 8.87, the standard instruction for considering other criminal activity under section 190.3, factor (b). Defendant argues that the instruction's reference to "the criminal act which involved the express or implied use of force or violence or the threats of force or violence" removed from the jury the issue whether defendant's acts involved the use or threat of force or violence and improperly directed the jury to find that the other crimes involved force or violence.

Initially, we reject the Attorney General's argument that the issue is forfeited because defendant failed to object at trial to the instruction. (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 302; *People v. Gray* (2005) 37 Cal.4th 168, 235.)

On the merits, we have repeatedly rejected defendant's claim. CALJIC No. 8.87's " 'characterization of other crimes as involving express or implied use of force or violence, or the threat thereof, is a legal question properly decided by the court.' " *People v. Burney* (2009) 47 Cal.4th 203, 259; *People v. Loker*, *supra*, 44 Cal.4th at p. 745.)

*5. Misdemeanor Conviction as an Aggravating Circumstance*

Defendant contends that the trial court committed prejudicial error in instructing the jury it could consider his prior misdemeanor conviction under section 190.3, factor (c). Although we agree that the instruction was error, we find that it was not prejudicial.

The jury was instructed that: "Evidence has been introduced for the purpose of showing that the defendant has been convicted of the crimes of assault with a firearm, a violation of Penal Code section 245(a)(2), and shooting at an inhabited dwelling, Penal Code section 246, a misdemeanor, prior to the offense of murder in the first degree of which he has been found guilty in this case. [¶] Before you

may consider any of such crimes as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant was, in fact, convicted of the prior crimes." (CALJIC No. 8.86.)

A misdemeanor conviction may not be introduced in aggravation. (*People v. Osband* (1996) 13 Cal.4th 622, 735; *People v. Montiel* (1993) 5 Cal.4th 877, 936.) Despite the erroneous instruction, the prosecutor and defense counsel, during argument, correctly referred only to the prior felony assault conviction as section 190.3, factor (c) evidence. Here, the error was harmless because the jury could properly consider under section 190.3, factor (b), the violent criminal conduct underlying the misdemeanor offense, i.e., shooting into a house with adults and children inside. (*People v. Bunyard* (2009) 45 Cal.4th 836, 857 [§ 190.3, factor (b) applies to misdemeanor violent activity as well as felony activity]; *People v. Ashmus* (1991) 54 Cal.3d 932, 983-984 [evidentiary and instructional error allowing jury to consider subsequent felony conviction under § 190.3, factor (c) harmless; underlying violent criminal conduct properly admitted under § 190.3, factor (b)].) The danger that the jury would assign significant additional aggravating weight to the fact of conviction was minimal. (*People v. Montiel*, *supra*, 5 Cal.4th at p. 936.)

### 6. Challenges to the Death Penalty Law

Defendant challenges California's death penalty law for reasons previously rejected by this court in other cases. He raises no basis for reconsideration of these rulings.

"Specifically, the death penalty law adequately narrows the class of death-eligible defendants." (*People v. Hawthorne*, *supra*, 46 Cal.4th at p. 104.) Section 190.3, factor (a), is not applied in such a "wanton and freakish" manner that it results in the arbitrary and capricious imposition of the death penalty in violation

of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1096.) " ' "The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. [Citations.] The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination." ' " (*People v. Hawthorne*, *supra*, 46 Cal.4th at p. 104.) Moreover, jury unanimity is not required with regard to unadjudicated criminal activity. (*People v. Dykes* (2009) 46 Cal.4th 731, 799.) The trial court was not required to instruct the jury that there is no burden of proof at the penalty phase, and that the beyond-a-reasonable-doubt standard and requirement of jury unanimity do not apply to mitigating factors. (*People v. Mendoza*, *supra*, 52 Cal.4th at pp. 1096-1097.) Defendant was not entitled to an instruction regarding a presumption of life. (*People v. McKinnon* (2011) 52 Cal.4th 610, 698.) The use of such adjectives in the sentencing factors statute as "extreme" (§ 190.3, factors (d) & (g)), and "substantial" (§ 190.3, factor (g)) is constitutional. (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1098.) A trial court is not required to delete inapplicable sentencing factors or to instruct that statutory mitigating factors are relevant solely as potential mitigators. (*Id*. at p.1097.) Intercase proportionality review is not constitutionally required. (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 698.) Equal protection principles do not require the same procedural safeguards that apply to sentencing determinations in noncapital trials. (*People v. Clark*, *supra*, 52 Cal.4th at p. 1008.) Finally, defendant's sentence does not violate international law, "as no authority 'prohibit[s] a sentence of death rendered in accordance with

state and federal constitutional and statutory requirements.' " (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 698.)

### 7. *Cumulative Prejudice in Guilt and Penalty Phases*

Defendant contends that the cumulative prejudicial effect of the errors in both the guilt and penalty phases mandates reversal of his conviction and sentence of death.  We have rejected nearly all of defendant's claims of error.  Where we have found error, we have determined defendant was not prejudiced.  Whether such claims are considered individually or together, we find no prejudicial error at either phase of the proceedings.

## DISPOSITION

We affirm the judgment.


**CHIN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Streeter

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S078027
**Date Filed:** June 7, 2012

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Bob N. Krug


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Andrew S. Love, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala G. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary S. Schons, Assistant Attorney General, Annie Featherman Fraser and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Andrew S. Love
Deputy State Public Defender
221 Main street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Melissa Mandel
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2211